K.M., on Behalf of her son, D.G., an infant, Plaintiff,

v.

HYDE PARK CENTRAL SCHOOL DISTRICT, et al., Defendants.

No. 03 CIV. 6010.

United States District Court, S.D. New York.

Aug. 11, 2005.

Barbara J. Ebenstein, Scarsdale, NY, for Plaintiff.

Daniel–Petigrow, Donoghue, Thomas, Auslander & Drohan, Hopewell Junction, NY, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

Plaintiff K.M. is the parent of D.G., a child with a disability. D.G. was born January 29, 1988, and has been diagnosed with Pervasive Developmental Disorder (PDD–NOS) and dyslexia, with normal intelligence.[1] (Cmplt.¶ 3.) Plaintiff commenced this action on behalf of D.G. against the Hyde Park Central School District (the "District") and defendants Kevin Sheehan,[2] President of the Board of Education, David Burpee, the Superintendent of Schools, and Geoia Liberty, Section 504 Compliance Officer and Assistant Superintendent for Pupil Personnel Services,[3] in their individual and official capacities on August 11, 2003, alleging the following causes of action: (1) intentional discrimination in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, 705, 794 and 794a ("Section 504") and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("Title II"); (2) disability harassment in violation of Section 504; (3) disability harassment in violation of the ADA; (4) violation of § 1983 of the Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983"); and (5) violation of Article XI, § 1 of the New York State Constitution ("Article XI").

---

**1.** Defendants "deny" this claim in their Answer (¶ 3); however they do not provide any contradictory evidence. Defendants also admit D.G. is a qualified student with a disability for purposes of IDEA, (Def. 56.1 ¶ 1).

**2.** Plaintiff lists him as "Kevin Sheedhan" in the caption, however defendants' papers spell his last name "Sheehan." Defendants also note that Mr. Sheehan assumed his post as the President of the District's Board of Education in July 2003, and that Ms. Liberty assumed her position as the District's Section 504 Compliance Officer in July 2002—both after the events complained of in this suit. (Def. Mem. at 1.)

**3.** Rose Marie Santora, a former Section 504 Compliance Officer, is also named as a defendant in the Complaint. Defendants assert, however, that plaintiff never effected service of process on Ms. Santora, (*see* Def. 56.1 Statement at 2 n. 1), and plaintiff has not refuted this. Examination of the record confirms there is no proof of service on Ms. Santora.

The allegations against the District and the individual defendants arise from their handling of events which lead plaintiff to file a Section 504 complaint on November 16, 2001 (the "Section 504 Complaint"). (Complaint of [K.M.] on behalf of her son, [D.G.] v. Hyde Park Central School District, dated November 15, 2001, Pl. Exh. 3). In the Section 504 Complaint, plaintiff alleged that D.G. suffered disability-based peer-to-peer harassment throughout the 2000–01 school year and the first two months of the 2001–02 school year, and that the defendants' failures to intervene amounted to actionable disability discrimination.

An impartial hearing was commenced pursuant to Section 504 on March 19, 2002. The impartial hearing officer had not issued a final decision by the date of the filing of this action, August 11, 2003 (a full year after the completion of the hearing). (Def. 56.1 at ¶ 11.) Another impartial hearing was commenced pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq., ("IDEA"), sometime in April 2002.[4] The parties reached a settlement disposing of all of plaintiff's IDEA claims on May 20, 2003. (Def. 56.1 ¶ 18.) As a result, there are no IDEA claims in this action.

In this action, plaintiff alleges that defendants are liable for their mis-handling of the peer-to-peer disability-based harassment D.G. experienced at school, and that the defendants' failures—which continued after the Section 504 Complaint was filed—rose to the level of intentional discrimination.

The defendants have moved for summary judgment on all claims on the following grounds: (1) plaintiff has failed to show that there are any genuine issues of material fact regarding disability discrimination under Section 504 or the ADA; (2) the individual defendants are entitled to qualified immunity on the Section 1983 claims, and no such claim can lie against the District; and (3) no private cause of action exists under Article XI.

I find that there are numerous disputed issues of material fact in this case that preclude summary judgment.

What follows are plaintiff's and defendants' versions of events. Where defendants' version is "admitted" because no correspondingly numbered Rule 56.1 Statement was submitted by plaintiff, I will so note.[5] Where defendants' version is controverted by the evidence, I will also note.

---

4. No exact dates are given for the IDEA hearing. (See Def. 56.1 ¶¶ 13, 14.)

5. Plaintiff's 56.1 Statement does not correspond to defendants', and does not specifically controvert any of defendants' claims, thus it does not conform to Local Rule 56.1. As a result, defendants' uncontroverted paragraphs that are supported by evidence in the record are deemed admitted for purposes of this motion. (Local Rule 56.1 requires that, "The papers opposing a motion for summary judgment shall include *a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing* a separate, short and concise statement of *additional* material facts as to which it is contended that there exists a genuine issue to be tried." (Emphasis in original.) Further, the Rule states that, *"Each numbered paragraph in the statement of* material facts set forth in the statement required to be served by the moving party will be deemed to be admitted *for purposes of the motion* unless *specifically* controverted by *a correspondingly numbered paragraph in* the statement required to be served by the opposing party." (Emphasis in original.)) There are several numbered statements of fact in Defendants' Rule 56.1 Statement that merely recount testimony. I am not including them as "admitted" facts because there are credibility issues regarding this testimony.

*1. Plaintiff's Version of Events*

At all relevant times, D.G. was a qualified individual with a disability within the meaning of Section 504 and the ADA. (Cmplt.¶ 5.)

During the 2000–01 and 2001–02 school years, D.G.—who was a 13-year-old eighth-grader in 2001—was the victim of repeated instances of being called "stupid," "idiot," "retard" and other "disability-related insults" and acts of "physical aggression" and intimidation (all by other students) while in school and on the school bus. (Section 504 Complaint, Pl. Exh. 3 ¶¶ 4, 12, 13.) Specifically: (1) D.G. was "thrown to the ground," "body slammed" and taunted by several students during lunch one day in September 2000,[6] until an aide intervened and took D.G. to a school nurse; (2) D.G. was physically beaten by two boys—held down and hit on the head and back with his own binder—between classes in his special education teacher's resource room on March 30, 2001; (3) D.G. was subjected to "disability-related slurs," and his school books were thrown into the garbage in the cafeteria on five to eight separate occasions during the early part of the 2000–01 school year, resulting in his special education teacher's offering to eat lunch with D.G. in a separate room for the remainder of the 2000–01 school year (D.G. did eat with her there for the rest of the school year); (4) an unidentified student called D.G. a "retard" and started a fist fight on an afternoon bus ride on October 20, 2001; (5) an unidentified student took D.G.'s planner "over his protests" on October 22, 2001 (D.G. allegedly was too afraid to tell his special education teacher who did it); and (6) two students repeatedly taunted and hit D.G. on an afternoon bus ride on November 1, 2001, after which D.G. returned home upset, "locked himself in the bathroom, cried, and yelled 'I can't stand this anymore,'" and then bolted from the house. (Pl.Exh. 3, ¶¶ 4–8, 13–17.)[7]

Each incident was promptly reported—by D.G. himself and/or by his mother—to school officials at the Haviland Middle School, but no action was taken to protect D.G. from further harassment. (Pl. Exh. 3 ¶¶ 4–6, 8, 9, 11, 12, 14, 16.) Plaintiff expressed her concerns for D.G.'s "physical and emotional safety" at a meeting of the Committee on Special Education ("CSE") on April 2, 2001. At the CSE's suggestion (presumably shortly after this CSE meeting, but no date is given), plaintiff met with Dr. Gilbert, then the school principal, and advised him of the "hostile environment," the "repeated disability-related name-calling, repeated acts of physical aggression and intimidation based upon disability, and continuous isolation of [D.G.] at lunch." (Pl. Exh. 3 ¶ 11.) She claimed that the "District took little or no action to alleviate the hostile environment or protect [D.G.] from further incidents" at that time. (*Id.*)

On October 14, 2001, plaintiff spoke with Lisa E. Macklin, the school psychologist, and reported the hostile environment and incidents of physical and emotional abuse. She claims that Ms. Macklin told her D.G. should handle these incidents by himself.

---

**6.** As discussed below, it appears this incident might have occurred in November 2000. Whether it occurred in November or September is irrelevant for purposes of this motion.

**7.** The Section 504 Complaint also noted that D.G. had "thrown up on the school bus" without specifically stating that this was caused by the stress of the school situation.

However a counseling evaluation attached to the instant Complaint notes that D.G. "was vomiting regularly out of stress" from school around November 2001. (*See* Complaint, Exh. 7, Treatment Summary for D.G., dated 6/12/02, by Ina Berg, CSWR, of Astor Counseling Services.)

(*Id.* at ¶ 14.) Mrs. Macklin had done a psychological evaluation of D.G., after which she had reported, on March 30, 2001, that D.G. "states that he does not enjoy school and has had difficulties with his peers." (Pl. Exh. 3 ¶ 10.) Plaintiff claims that the District should have acted on this report but that it did not. (*Id.*)

The day after the November 1, 2001 incident on the bus, plaintiff went to the Superintendent to report the recent incidents, but "no one was available to talk to her." (Pl. Exh. 3 ¶ 12.) On the same day, November 2, 2001, she also tried to meet with George Treadwell, the head of transportation, but he was not available. (*Id.* at ¶ 18.) She left a message for Mr. Treadwell that was not returned. (*Id.*) She also claimed that she attempted to meet with Mrs. Carol Meissner, who was then the principal of Haviland Middle School, but was able to meet only with a Mrs. Linton, a Mr. Doyle (Deans of Students), Ms. Macklin and Mrs. Fasolino, D.G.'s then-current special education teacher. (*Id.* at ¶ 19.) Plaintiff was told at that meeting to keep D.G. out of school for an indeterminate period, but no educational services were arranged. Plaintiff also was told an "assistive technology device" specified on D.G.'s Individual Education Plan ("IEP") (but not identified in the moving papers) should not be used, as it would subject D.G. to additional taunting. (*Id.*)

Around this time (November 2001), Ms. Macklin "admitted" that she had evaluated D.G. the previous week and found him to be angry and frustrated, expressed her concern that D.G. had developed clinical depression, and referred plaintiff to the Astor Children's Guidance Center ("Astor") for evaluation and treatment at parental expense. (*Id.* ¶¶ 20–22.) Astor evaluated D.G., and a Mrs. Ina Berg, a social worker, informed plaintiff that D.G. had thought about harming himself in re-sponse to incidents at school. (*Id.* ¶ 23.) D.G. was admitted to the St. Francis Hospital Psychiatric Emergency Room on November 12, 2001.

Around November 7, 2001, D.G. was evaluated by Dr. Julia Speicher, psychiatrist, and Mrs. Berg at the Astor Guidance Center. (Cmplt.¶ 19.) They reported that D.G. had suicidal ideation in response to incidents of victimization at school. (*Id.;* Pl. Exh. C.) Around November 12, 2001, D.G. was evaluated at the St. Francis Hospital Psychiatric Emergency Room by Dr. Mark J. Cerbone, psychiatrist, who opined:

> [W]ith a reasonable degree of medical certainty ... if the patient does return to the school setting without a profound intervention being made by the school ... there will be a substantial risk of harm being committed by the patient towards himself or other students in response to this history of harassment in combination with the patient's deficits.

(Cmplt. ¶ 20; Pl. Exh. D.)

Dr. Speicher conducted a psychiatric assessment of D.G. on December 3, 2001 and confirmed that D.G. responded to long-term harassment at the Haviland Middle School with suicidal ideation. (Cmplt. ¶ 21; Pl. Exh. E.)

D.G. was kept out of school beginning November 3, 2001. He did not return for the rest of that school year. (*Id.* ¶ 22.) Plaintiff claimed in the Section 504 Complaint that no educational services were provided to D.G. during that time, (*id.*), however, in the instant Complaint, she alleges that the District provided an uncertified home tutor from January to April 2002. (Cmplt.¶ 18.)

*2. Defendants' Uncontroverted Statements*

The following assertions by defendants are not properly controverted by plaintiff

and are deemed admitted (and will be so presented at trial):

1. Plaintiff and her son have resided within the territorial bounds of the District since the summer of 2000. (Def. 56.1 ¶ 1.)

2. Plaintiff admitted to receiving the 2000–01 and 2001–02 school calendars and the Haviland Middle School Student Handbook, each of which included a statement of her child's Section 504 rights. (Def. 56.1 ¶ 11(a)(vi).)

3. Plaintiff advocated in person and in writing on several occasions concerning D.G.'s IEP and acknowledged, on one occasion, the District's concern for and interest in D.G. (Def. 56.1 ¶ 11(a)(vii).)

4. During a triennial evaluation of D.G. in the Spring of 2001, his seventh grade teachers reported that D.G. was performing well academically and socially; that he had good attendance; he was motivated to learn; and participated regularly in class. While D.G. stated he was having trouble relating with peers, the school psychologist who conducted the evaluation testified it did not impact his focus or demeanor throughout the testing. None of the records she reviewed disclosed he was a victim of peer harassment. (Def. 56.1 ¶ 11(a)(viii).)

5. The school psychologist testified that D.G. had severe auditory processing deficits. (Def. 56.1 ¶ 11(a)(ix).)

6. D.G.'s report cards for 2000–01 indicated he attended school regularly and received overall positive grades and comments about his academic work and classroom participation. (Def. 56.1 ¶ 11(a)(x).)

7. Mrs. Fasolino testified that, with respect to the October 22, 2001 "planner" incident, she never told plaintiff that D.G. was too afraid to tell her who took it. (Def. 56.1 ¶ 11(b)(iv).)

8. As part of Ms. Macklin's counseling evaluation, Mrs. Fasolino reported that D.G. became upset easily and appeared sensitive, and that he was frustrated by some academic assignments because of his auditory processing difficulties. Plaintiff reported to Ms. Macklin at that time that D.G. had difficulty doing work independently, and that he would become upset over his organizational abilities, but that his biggest worry was being picked on by other children. (Def. 56.1 ¶ 11(b)(vii).)

9. D.G. reported to Ms. Macklin, as part of this same evaluation, that he argues with other students outside of school, that he has a hard time making and keeping friends. However, he did not explain why it was hard to make and keep friends, and adamantly refused to participate in group counseling. (Def. 56.1 ¶ 11(b)(viii).)

10. On November 2, 2001, plaintiff met with Mrs. Fasolino, Ms. Macklin and the two Deans of Students a the Haviland Middle School, and informed them that a female sixth grader and her eighth grade brother had assaulted D.G. on the bus ride home from school the previous day (the November 1, 2001 incident discussed above), but she could not provide them with the names of the students. Plaintiff also told them that upon returning home from school on November 1, 2001, D.G. was upset, had locked himself in the bathroom, bolted out of the house and later threatened to throw himself in front of traffic.[8] (Def. 56.1 ¶ 11(b)(ix).)

11. After speaking with the bus driver, the pair of siblings who matched the description provided by the plaintiff and five other students who rode the bus, school

---

8. This last detail, about D.G. threatening to throw himself in front of traffic, was not mentioned in the Section 504 Complaint.

officials could not confirm the allegations plaintiff made regarding the November 1, 2001 incident. Consequently no one was disciplined. (Def. 56.1 ¶ 11(b)(xi).)

12. Plaintiff told Mrs. Fasolino that D.G. was going to be evaluated by the Astor Counseling Center on November 8, 2001, and they agreed that no homework would be sent home until after the evaluation was completed. Mrs. Fasolino testified that she called the plaintiff and left messages on November 8 and November 9, 2001, but plaintiff did not return her calls. On November 13, 2001, when Mrs. Fasolino reached the plaintiff by phone, plaintiff informed her that she had been advised by her attorney not to speak with Mrs. Fasolino. (Def. 56.1 ¶ 11(b)(xii).)

13. St. Francis Hospital conducted an emergency psychiatric assessment of D.G. on November 12, 2001, which resulted in D.G.'s referral to the Dutchess County Intensive Day Treatment program ("IDT") for a 30–day period. The District received this psychiatric assessment on November 16, 2001 as an attachment to the Section 504 Complaint. The referral was completed on November 28, 2001 by the school psychologist and an intake was scheduled for December 7, 2001. However, IDT would not accept D.G. unless it knew definitively what program he would be returning to at its conclusion, and because the plaintiff advised that she did not want D.G. to return to the Haviland Middle School, D.G. did not attend the IDT program. (Def. 56.1 ¶ 11(b)(xiii).)

14. The District's Compliance Officer for the 2001–02 school year, Rose Marie Santora, investigated plaintiff's Section 504 Complaint and issued a report on December 7, 2001, concluding that there had been no violation of Section 504 with respect to D.G. (Def. 56.1 ¶ 8.) Ms. Santora advised plaintiff that she would not consider incidents that may have occurred prior to October 17, 2001, since those incidents were not reported within the 30–day time period required by Hyde Park Central School District's "regulation 5311.3–R section A.1." (*See* Def. Exh. 6.) Plaintiff appealed this decision to Mr. Burpee, the Superintendent, who scheduled an informal hearing for January 16, 2002.

15. At the January 16, 2002 CSE meeting, plaintiff rejected the CSE's invitation to return D.G. to the Haviland Middle School, even though the school principal had suggested D.G. meet with the new student assistance counselor, adjust his workload, and come to school while students were not in session to "desensitize him." Plaintiff instead insisted on an out-of-district placement. (Def. 56.1 at ¶ 17(a).)

16. Following that hearing, Mr. Burpee issued a decision, dated January 30, 2002, finding that no violation of Section 504 had occurred with respect to D.G. during either the 2000–01 or 2001–02 school years. Mr. Burpee indicated that, in reaching this conclusion, he had considered events before October 17, 2001, because "the annual 'non-discrimination' notice does not provide parents with notice that written complaints must be filed within the 30 day period, and for equitable reasons." (Def.Exh. 9.) In his decision, Mr. Burpee also noted that the Superintendent was required by regulation to propose an equitable resolution of a Section 504 Complaint, and that he was "concerned about [D.G.]'s emotional state." (*Id.*) As a result, Mr. Burpee recommended that: (1) the CSE expeditiously and thoroughly investigate alternative placements, including out-of-district schools, that would meet D.G.'s needs; (2) the CSE consider plaintiff's claim for compensatory educational services; and (3) the District consider reimbursing plaintiff for the private psychologi-

cal and psychiatric interventions. (Def. 56.1 at ¶ 9.)

17. Plaintiff appealed Mr. Burpee's decision to the District's Board of Education. (*Id.* at ¶ 10.) The Board of Education appointed Eric Zaidins as an impartial hearing officer to conduct a formal Section 504 Hearing. (*Id.*) Mr. Zaidins held the Section 504 Hearing over four days, between March 19 and July 25, 2002. Oral testimony and written evidence was produced.

18. Mr. Zaidins never issued a final decision. (Def. 56.1 ¶ 12.)

19. On April 2, 2002, after the second day of the Section 504 Hearing, the plaintiff filed a request for an impartial hearing pursuant to IDEA to challenge the District's evaluations, placement and services for the 2000–01 and 2001–02 school years.(Def. 56.1 ¶ 13.)

20. On the first day of the hearing,[9] the District agreed to reimburse plaintiff for private counseling services and the private psychiatric and psychological evaluations and to provide individual speech services to compensate for missed group speech sessions, since D.G. went out on home instruction. On the second day of the hearing, the parties reached an interim settlement, pursuant to which the District agreed to provide a six-week summer program for D.G. at the Dunneback Camp at the Kildonan School, a non-approved private school serving students with disabilities, located in Amenia, New York, and to place D.G. in the Konsul School with a 1:1 certified special education teacher to provide home instruction through the remainder of the 2001–02 school year. (Def. 56.1 at ¶ 14.)

21. On June 12, 2002, D.G.'s private counselor (not identified) reported that D.G's self-esteem, confidence and overall happiness had improved since being out on home instruction, and that it would continue to improve at Kildonan. (Def. 56.1 at ¶ 15.)

22. On August 12, 2002, plaintiff requested that the impartial hearing be re-opened on the issue of the additional compensatory education.[10] (Def. 56.1 at ¶ 16.) Plaintiff sought placement at the Kildonan School and the remaining unreimbursed counseling fees. (*Id.*)

23. All of plaintiff's IDEA claims for the 2000–01, 2001–02, 2002–03 and 2003–04 school years were resolved by a stipulation of settlement dated May 20, 2003, under which the District agreed to pay the plaintiff the sum of $76,250 "in full and final settlement of all claims for tuition reimbursement, compensatory education damages, attorney's fees, expert or consultant fees." (Def. 56.1 at ¶ 17.) Under this agreement, D.G. was permitted to remain at Kildonan, at the District's expense, for not only the 2002–03 school year, but also the 2003–04 school year. In exchange, the plaintiff agreed to withdraw all IDEA claims from September 1, 2000 through June 30, 2004. (*Id.* at ¶ 18.)

### 3. Defendants' Disputed Statements

The following assertions of "undisputed fact" by defendants are not, in fact, undisputed, as the record clearly demonstrates.

1. During the 2000–01 school year, D.G. was the subject of two incidents involving physical contact. The first, on November 1, 2000, involved two students

---

9. Defendant does not specify which hearing, but presumably this was the IDEA hearing, since that is the only interpretation of this paragraph that makes sense. No actual dates are given for the IDEA hearing.

10. Again, this appears to be the IDEA hearing, though defendants do not say.

jumping on top of D.G. after he tripped and fell.[11] Both perpetrators were identified and sent to the main office. The second incident occurred on March 30, 2001; D.G. was "assaulted" by two students in the resource room. The two perpetrators were suspended from school for five days. (Def. 56.1 at ¶ 11(a)(i).)

Defendants cite to two "Incident Reports" and a page of plaintiff's Section 504 Hearing testimony for these descriptions. The nurse who filled out the Incident Report for the March 30, 2001 incident stated that, "When [D.G.] went into the Resource Room, R. grabbed him and then he and T. punched him and grabbed the front of his shirt and skin by his neck. They 'tossed' him into garbage cans in the room. They (T. and R.) ran out of the room when the teacher came." (Def.Exh. 12.) In the space stating, "Please describe any prior events with same individuals," the nurse wrote, "T. has 'beaten up' on [D.G.] 'a lot' of times before. [D.G.] has spoken with his guidance counselors and teachers about this." (*Id.*) In the section stating, "Why/Reasons/Justifications?" the nurse wrote what appears to be a direct quote from D.G., " 'He always does that.' " (*Id.*) Thus, the Incident Reports cited by defendants do not confirm that there were only two instances of "physical contact" during the 2000–01 school year, and they raise doubts about D.G.'s teachers' professed ignorance, discussed below, of the ongoing harassment D.G. claims he was experiencing from other students.

2. Plaintiff never wrote to school officials complaining about either the November 1, 2000 "playground" incident or the March 30, 2001 classroom incident. (Def. 56.1 ¶ 11(a)(iv).)

The transcript shows, however, that plaintiff testified to speaking to Dr. Gilbert, the principal, about D.G. "many times." (Def.Exh. 15.)

3. D.G.'s 2000–01 special education teacher, Ms. Muldoon, invited D.G. to eat in her classroom with two other students and her teaching assistant. Ms. Muldoon testified that D.G. enjoyed eating lunch in the resource room, benefited from the quieter setting, and never expressed a desire to return to the lunchroom. (Def. 56.1 ¶ 11(a)(ii).) Plaintiff never complained to the principal about D.G.'s eating his lunch in Ms. Muldoon's room. (Def. 56.1 ¶ 11(a)(v).)

The transcript shows that plaintiff testified that she told Ms. Muldoon she was "not happy with" D.G.'s eating in her room instead of the cafeteria. (Def.Exh. 16.) Plaintiff admits she never asked to have D.G. put back in the cafeteria for lunch. (*Id.*) Ms. Muldoon testified that there were "no complaints" from plaintiff about D.G. eating with her, but in response to an inquiry as to whether they ever spoke about it, Ms. Muldoon answered, "I don't know" and "I don't recall." (*Id.*) The cited testimony says nothing about whether plaintiff contacted the principal.

4. Plaintiff failed to inform the District about the November 1, 2000 and March 30, 2001 incidents. (Def. 56.1 ¶ 11(a)(vii).)

In light of the nurse's reports, discussed above, and other evidence that plaintiff repeatedly contacted various school administrators about D.G.'s difficulties, defendants' claim is impossible to credit.

5. Mrs. Fasolino testified that she met regularly with D.G.'s team of teachers to discuss specific student concerns, that D.G.'s name never came up in terms of

---

11. This may be the same incident that plaintiff described in her Section 504 Complaint as having occurred in "September 2000," however it is not possible to determine this with certainty based on the record before me.

being a victim of harassment by other students, that neither she nor his other teachers had observed such incidents, and that D.G. was doing well in his classes. (Def. 56.1 ¶ 11(b)(i).) Mrs. Muldoon also so testified. (Def. 56.1 ¶ 11(a)(iii).)

The transcript also reveals that plaintiff had requested a meeting with D.G.'s team of teachers, and that they did meet with her on September 26, 2001. (Def.Exh. 23.) According to Mrs. Fasolino's testimony, plaintiff told the teachers that D.G. "was being picked on," that he was "not always comfortable in school," and that he was eating lunch alone. (*Id.*) The record does not support the claim that D.G.'s name "never came up" in those team meetings as a victim of peer harassment. Moreover, given the overall record, there are issues about the credibility of the school employees that I decline to resolve on a motion for summary judgment.

6. When plaintiff complained about an out-of-school email D.G. had received from a classmate, Mrs. Fasolino testified that the teachers agreed to move the student away from D.G., even though they had never observed in-school harassing behavior by the classmate. (Def. 56.1 ¶ 11(b)(iii).)

The transcript also shows that Mrs. Fasolino was "shocked" by the content of the email at issue, and that the rest of the teaching team was shocked as well. However, the content of the email is not disclosed in the record. (Def.Exh. 23A.)

7. During Ms. Macklin's counseling evaluation during the fall of 2001, all of D.G.'s teachers reported that he was doing nicely and did not observe any social or emotional issues interfering with his academic performance, and D.G.'s five-week

progress report for the first marking period confirmed that he was performing well in all academic areas. (Def. 56.1 ¶ 11(b)(v).) When Ms. Macklin spoke with plaintiff on October 16, 2001,[12] plaintiff did not mention any teasing incidents or that D.G. was the subject of repeated disability-related name calling, physical aggression or intimidation based on his disability. (Def. 56.1 ¶ 11(b)(vi).)

The evidence cited by defendants is a handwritten log with no heading, apparently admitted as Ex. 37P at the Section 504 Hearing. (*See* Def. Exh. 25.) It appears to be Ms. Macklin's handwritten notes about D.G. on various dates beginning with April 2001 and ending in December 2001. However, the notes are written in a manner that suggests they were likely recorded long after the events they chronicle. For example, the entry for April 2001 reads:

> [D.G.] was referred for a counseling consultation for the 2001–2002 school year as part of his Annual Review at the end of the school year 2001. (7th grade) Mom expressed concerns for [D.G.]. These concerns were not brought to my attention by the parent or teachers or an administrator prior to [D.G.]'s annual review. Moms [sic] concerns at that time were academic and she reported an incident that occurred with another peer that the Principal was taking care of. No other concerns by the teachers were expressed to me while [D.G.] was in 7th grade.

D.G. still would have been in 7th grade in April 2001, indicating the note likely was written later than April 2001. Similarly, the next entry, dated September 12, 2001, reads:

12. In her Section 504 Complaint, plaintiff had stated this meeting took place on October 14, 2001. The exact date in October is irrelevant for purposes of this decision, as I am reasonably certain the parties refer to the same meeting between plaintiff and Ms. Macklin.

CSE Meeting to discuss the recommendations from the Audiologist. I also spoke briefly with [K.M.] about the counseling consultation for this school year. Her consent was given. Teachers expressed *NO* concerns emotionally/socially at this time.

(Emphasis in original.) The entry dated "By 10/15" reads, "Marking—5 week marking period Progress Reports *out.* [D.G.]'s commented as doing very well in all academic areas. Teachers still conveying no concerns."

Ms. Macklin's notes (if that is what these are) also indicate that D.G. was telling her he had a hard time getting classwork and homework done, he worried about grades, felt bad about school work, and had a hard time making and keeping friends. The entry dated "11/2" states that plaintiff met with Ms. Macklin and Mrs. Fasolino and told them that students were teasing D.G. on the bus. Ms. Macklin's notes also state, "This was the first time that I was aware that *other* students were making fun of and teasing" D.G. (Emphasis in original.) Again, there are credibility issues regarding this document.

8. Defendants state that, after plaintiff met with Haviland Middle School Staff (Mrs. Fasolino, Ms. Macklin and the two Deans of Students) on November 2, 2001, the staff "promptly offered an action plan" that included: (1) suggesting that D.G. be evaluated immediately by a psychiatrist and giving plaintiff information to obtain an emergency evaluation; (2) investigating the bus incident, which would involve pulling the bus list to attempt to identify the students responsible, speaking with other students on the bus and the driver and making a list of students who should be spoken to about bullying; (3) having D.G. take a couple of days off from school "due to D.G.'s fragile emotional state," with

Mrs. Fasolino sending work home during that time. (Def. 56.1 ¶ 11(b)(x).)

One of the letters cited by defendants, from Mrs. Fasolino to Mr. Burpee dated January 11, 2002 (Def.Exh. 9), notes that D.G. was receiving home tutoring, that he had completed "most academic tasks for the second marking period," and that the teachers would "continue to maintain academic correspondence through [D.G.]'s home tutor."

In addition, the exhibits cited by defendants include a letter from Mr. Burpee to plaintiff's attorney dated January 31, 2002, in response to their request for an appeal of the determination of the Section 504 Compliance Officer that no Section 504 violation had occurred during the 2000–01 and 2001–02 school years. (Def.Exh. 9.) Mr. Burpee also concluded that no Section 504 violation had occurred (he affirmed Ms. Santora's decision). In the letter, he noted that there were:

conflicting statements about whether any bus-related incidents of taunting or physical aggression towards [D.G.] occurred during the 2000–2001 school year. Although [plaintiff] stated that students who were sitting in the front seat continuously tripped [D.G.] as he got off the bus, and that Dr. Gilbert was made aware of these incidents, [D.G.] states that he experienced no problems on the bus last year. Compounding this inconsistency is the lack of any written referrals or reports of any misconduct directed towards [D.G.] while on the bus during the 2000–2001 school year.

(*Id.*)

Mr. Burpee's letter also noted that D.G. had stated that his books had been tossed in the garbage on two or three occasions during the 2000–01 school year, that D.G. had not reported the instances of abuse on the bus prior to November 1, 2001, and that D.G. appeared to be doing well in the

fall of 2001 until the end of October, when his special education teacher noted a change in D.G.'s "general attitude."[13]

Finally, Mr. Burpee's letter stated that he was "concerned about [D.G.]'s emotional state," which, according to recent psychiatric reports, was depressed and frustrated because of the "peer victimization." As a result, Mr. Burpee recommended that the CSE "expeditiously and thoroughly investigate any and all placements, including those out-of-district, which would meet his educational needs."

A letter from Ms. Linton, Dean of Students, also cited by defendants, noted that, on November 2, 2001, she and plaintiff discussed the possibility that students were "pretending to be [D.G.]'s friends, giving him a false sense of security. Due to [D.G.]'s disability, he would not be able to tell if the students were just 'using' him." Linton added, "This was the first and only time I was made aware of any problem involving" D.G. (Def.Exh. 9.)

Ms. Macklin's testimony, cited by defendants here, also notes that plaintiff's mother was "very upset" at the November 2, 2001 meeting. (Def.Exh. 30.) Ms. Macklin testified that plaintiff told her D.G. "was refusing to come to school, he was scared to return to school. She was upset... There was an agreement that maybe D.[G.] needed a couple of days just at home, relax, find out how he is doing before he returned to school." Ms. Macklin testified that at this meeting, she suggested plaintiff bring D.G. to Astor Counseling Services for an emergency evaluation.

9. After IDT refused to accept D.G. in November 2001, the District began supplying a home-instruction tutor. (Def. 56.1 ¶ 11(b)(xiv).) D.G. received positive report card grades indicating he received 70's and 80's in his core academic classes for the 2001–02 school year, inclusive of the period he went out on home instruction (e.g., from November 2001 to June 2002). (Def. 56.1 ¶ 17(c).)

Plaintiff claimed the tutor was uncertified, and that home instruction was not provided until January 2002 and was discontinued in April 2002. (Cmplt.¶ 18.)

10. For the remainder of the 2001–02 school year, the District referred D.G. to a number of out-of-district placements. The ones that had an available spot for D.G. were rejected by the plaintiff. (Def. 56.1 at ¶ 17(b).)

The evidence cited by defendants includes a letter dated February 27, 2002 to the Pawling Middle School from Lisa Quinn, CSE Chairperson for the Hyde Park Central School District. It also includes nine letters from Ms. Quinn dated April 26, 2002 and one letter dated April 15, 2002 to other out-of-district middle schools recommending D.G. for placement at those schools. (Def.Exh. 38.) The evidence does not show which schools had spots for D.G. nor which, if any, plaintiff rejected.

## Discussion

Under Rule 56(c) of the Federal Rules of Civil Procedure, a court will grant summary judgment if the evidence offered

---

13. Mr. Burpee's letter contains several statements that D.G. (a) never reported instances of abuse at school or on the bus to any school official, and (b) that D.G. stated he did not recall hearing simultaneous disability-related slurs from the students who beat him up. (Def.Exh. 9.) Mr. Burpee's letter notes that these statements are based on "written and

oral evidence furnished to me at the informal hearing." (*Id.* at 3.) However, the Court cannot locate in the instant record or in the transcript of the formal Section 504 hearing (which admittedly took place after Mr. Burpee wrote his letter) any evidence to support these claims. D.G. did not testify at the formal Section 504 hearing before Mr. Zaidins.

shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir. 1987). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

### 1. Section 504 and ADA Claims

In a discussion of the enactment of the Rehabilitation Act, the United States Supreme Court noted that, "Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 717, 83 L.Ed.2d 661 (1985).

■ Section 504 of the Rehabilitation Act and Title II of the ADA were designed to protect disabled persons from discrimi-

nation, both intentional and unintentional, in the provision of public services. *Weixel v. Bd. of Educ.,* 287 F.3d 138, 146 (2d Cir.2002). Section 504 provides:

> No otherwise qualified individual with a disability ... shall, solely by reason of her of his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

29 U.S.C. § 794. Similarly, Title II of the ADA states:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12134.

■ "Apart from the Rehabilitation Act's limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes are precisely the same." *Weixel, supra,* 287 F.3d at 146 n. 6; *see also Rodriguez v. City of New York,* 197 F.3d 611, 618 (2d Cir.1999) (considering Section 504 and ADA claims in "tandem"). The Section 504 and Title II claims are therefore analyzed together. *Henrietta D. v. Bloomberg,* 331 F.3d 261 (2d Cir.2003); *see also D.D. v. New York City Bd. of Educ.,* No. 03 Civ. 2489(DGT), 2004 WL 633222 at *17 (E.D.N.Y.2004).

■ Plaintiff must offer proof that (1) D.G. has a disability for purposes of Section 504 and Title II; (2) he was otherwise qualified for the benefits he was denied; (3) he was denied the benefit by reason of

his disability.[14] *Weixel, supra,* 287 F.3d at 146–47; *Henrietta D., supra,* 331 F.3d at 272.

■ Both Section 504 and Title II define a "disabled individual" as one who "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(2). A three-part test exists for determining whether a person is disabled under these statutes, *see Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) and *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 641 (2d Cir.1998). Under *Colwell,* plaintiff must (i) show that D.G. suffers from a physical or mental impairment, (ii) identify the activity claimed to be impaired and establish that it constitutes a "major life activity" (in this case, learning); and (iii) show that D.G.'s impairment "substantially limits" the major life activity identified. *See Weixel,* 287 F.3d at 147.

■ In this case, there is no genuine dispute that D.G. is disabled for purposes of Section 504 and Title II. Defendants concede D.G. is a qualified student with a disability for purposes of IDEA. (Def. 56.1 ¶ 1.) "The definition of individual with a disability under section 504 of the Rehabilitation Act is broader in certain respects than the definition of a child with [a] disabilit[y]" under IDEA. *Muller v. Committee on Special Education,* 145 F.3d 95, 100 n. 2 (2d Cir.1998); *see also Grant v. St. James Parish Sch. Bd.,* No. Civ. A 99–

3757, 2000 WL 1693632 (E.D.La. Nov. 8, 2000) ("Although the two laws overlap significantly, it is well recognized that Section 504 covers more students than does the IDEA."). Therefore, because D.G. qualifies as a student with a disability under IDEA, he is considered an individual with a disability for purposes of Section 504 and Title II.[15]

Similarly, no dispute has been articulated regarding D.G.'s entitlement to access to public school and its special education programs.

Documents cited by defendants—specifically, the January 31, 2002 letter from Mr. Burpee to plaintiff—half-heartedly claim that there was no evidence that D.G. was being tormented because of his disability. Mr. Burpee stated in his letter that D.G. had not testified that the various students who abused him called him names while they were beating him up. (Def. Exh. 9 at 3.) I do not find these conclusory and self-serving statements, made in the context of administrative hearings that were a prelude to litigation, sufficient to refute plaintiff's allegation that D.G. was harassed on the basis of his disability. In fact, much in the record suggests that D.G. was harassed, and nothing in the record suggests that D.G. was harassed on any basis *other* than his disability.

■ A plaintiff may recover money damages under the ADA or Section 504 by showing a statutory violation resulted from "deliberate indifference" to the rights secured the disabled by those statutes. *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn,* 280 F.3d 98 (2d Cir.2001) (citing

14. There is no dispute that Hyde Park Central School District is a public entity that receives federal funding, making it subject to the requirements of both Title II and Section 504.

15. Moreover, defendants' 56.1 Statement, (par. 11(a)(ix)), includes the assertion that the

"school psychologist testified that D.G. had severe auditory processing deficits." In addition, defendants have not offered any evidence to rebut plaintiff's claim that D.G. suffers from Pervasive Developmental Disorder and Dyslexia. (Cmplt. par. 3.)

*Bartlett v. New York State Bd. of Law Exam'rs,* 156 F.3d 321, 331 (2d Cir.1998), *vacated on other grounds,* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999)). These standards apply to a school district and its administrators whose actions allegedly discriminated against the student; they do not impose liability on the school simply for the actions of other students.

School district liability for peer-to-peer disability-based harassment under Section 504 and the ADA has not been directly addressed by the United States Supreme Court or the Second Circuit, however the Supreme Court has addressed school district liability for peer-to-peer sexual harassment in violation of Title IX. *Davis v. Monroe,* 526 U.S. 629, 650, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); *see also, e.g., Pell v. Trustees of Columbia Univ.,* No. 97 Civ. 0193(SS), 1998 WL 19989 (S.D.N.Y. Jan. 21, 1998) (finding that hostile educational environment claims apply the same standards as those of Title IX). The *Davis* Court held that a school district can be held liable if it is "deliberately indifferent" to peer sexual harassment and its response is "clearly unreasonable in light of the known circumstances." 526 U.S. at 648–49, 119 S.Ct. 1661; *see also Gebser v. Lago Vista Independent Sch. Dist.,* 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (finding school district could be liable in damages under Title IX when it is deliberately indifferent to the known acts of sexual harassment by a teacher).

In *Davis,* the evidence showed that a school district was aware that one of its male high school students was regularly sexually harassing and even assaulting a fellow female student and did nothing to stop it for five months. The Court stated that a Section 504 or ADA claim against the school district for a Title IX violation arising out of peer-to-peer harassment could be sustained with proof that (1) the victim was harassed on the basis of her gender; (2) the alleged harassment was so severe, pervasive and objectively offensive that it altered the condition of her education and created an abusive educational environment; (3) the school district had actual notice about the gender-related harassment; and (4) the school district was deliberately indifferent to the harassment. *Davis,* 526 U.S. at 640–53, 119 S.Ct. 1661.

The Court stated that a school district sued for peer-to-peer harassment is not held liable for the actions of the harassing students; rather, it is held liable for its own "deliberate indifference" to the acts of the harassing students. 526 U.S. at 641–42, 119 S.Ct. 1661.

The *Davis* Court noted that children in school often act inappropriately, and that a child who refuses to go to school because a bully calls him a "scaredy cat" at recess will not have a claim under Section 504 or the ADA. *Id.* at 651–52, 119 S.Ct. 1661. "Damages are not available for simple acts of teasing and name-calling ..., even where these comments target differences in gender." *Id.* Rather, the conduct must be "serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." *Id.* at 652, 119 S.Ct. 1661.

In distinguishing actionable conduct from non-actionable, ordinary student teasing, the *Davis* Court gave a useful illustration:

The most obvious example of student-on-student sexual harassment capable of triggering a damages claim would thus involve the *overt, physical deprivation of access to school resources.* Consider, for example, a case in which male students physically threaten their female peers every day, successfully preventing the female students from using a partic-

ular school resource—an athletic field or a computer lab, for instance. District administrators are well aware of the daily ritual, yet they deliberately ignore requests for aid from the female students wishing to use the resource. The district's knowing refusal to take any action in response to such behavior would fly in the face of Title IX's core principles, and such deliberate indifference may appropriately be subject to claims for monetary damages. *It is not necessary, however, to show physical exclusion* to demonstrate that students have been deprived by the actions of another student or students of an educational opportunity on the basis of sex. Rather, a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the *victim-students are effectively denied equal access to an institution's resources and opportunities.*

526 U.S. at 650–51, 119 S.Ct. 1661 (emphasis added).

■ Based on this reasoning, a school district's deliberate indifference to pervasive, severe disability-based harassment that effectively deprived a disabled student of access to the school's resources and opportunities would be actionable under Section 504 and Title II.

The *Davis* Court also noted that the relationship between the harasser and the victim is relevant, especially in circumstances where the harasser would have more power over the victim (e.g., teacher-to-student harassment). 526 U.S. at 653, 119 S.Ct. 1661. Here, at least one school employee (Ms. Linton) noted that D.G. might not understand when other kids were "using" him because of his disability. Such a student—e.g., one who was developmentally impaired, like D.G.—probably

is not on equal footing to defend himself against harassment from his more able peers, leaving him vulnerable to abuse that the District should have anticipated and worked harder to prevent.

In addition, unnecessary social isolation has been considered a form of actionable discrimination. *See Olmstead v. L.C.*, 527 U.S. 581, 600–01, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (finding that the "unjustified institutional isolation of persons with disabilities is a form of discrimination," because the dissimilar treatment inherent to institutionalization requires persons with disabilities to "relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice."). Plaintiff's claims related to the lunchtime isolation appear to be such a claim. Admittedly, eating lunch alone is not the same thing as institutionalization. However, the comments of the *Olmstead* Court about the effects of needlessly relinquishing participation in community life apply here. Eating lunch with other students could be considered an integral part of the public school experience, one in which D.G. would be entitled to participate if a reasonable accommodation for his disability would make it possible.

■ Finally, "[i]t is a familiar cannon of statutory construction that remedial legislation should be construed broadly to effectuate its purpose." *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

■ Applying these standards to the instant case, I find that there are triable issues of fact precluding a grant of summary judgment on the Section 504 and Title II claims with respect to both the 2000–01 and 2001–02 school years. A rea-

sonable juror, looking at the evidence discussed above, could conclude that D.G. was subjected to severe and pervasive peer abuse, that this abuse was known to teachers and administrators in the District, and that it so altered the conditions of D.G.'s school experience that he felt he could not attend school for the better part of a year. *See Weixel*, 287 F.3d at 141–45 (mother refused to submit to placement of her disabled but gifted daughter in a class below her level, resulting in the need for home-schooling for the year, supporting (in part) Title II and Section 504 claims); *R.B. v. Bd. of Educ. of the City of New York*, 99 F.Supp.2d 411, 419 (S.D.N.Y.2000) (denying motion to dismiss a Section 504 claim where student was excluded from the classroom for an entire school year because of the school board's "gross neglect, incompetence and ineptitude").

Here, the District's mere denial of knowledge that harassment occurred does not create an issue of fact. First, that denial may well be found incredible, given the totality of the record. Second, the level of persistent disability-based physical and verbal intimidation alleged, and D.G.'s eventual refusal to go back to school, are similar to the "overt, physical deprivation of access to school resources" caused by male students who threaten weaker female students contemplated by the *Davis* Court. The defendants knew D.G. was disabled—not just dyslexic, but developmentally (and socially) disadvantaged. This put him in an obviously inferior position to his more able peers and left him vulnerable to the attacks that D.G. and his mother claim to have brought to the defendants' attention to no avail. The fact that D.G. continued to get good grades would not, by itself, relieve the defendants of their obligation to investigate and remedy intense abuse if D.G. was reporting it during the years at issue. *See, e.g., Davis*, 526 U.S. at 651, 119 S.Ct. 1661 (noting that whether

harassment is actionable "depends on a constellation of surrounding circumstances, expectations and relationships") (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). Similarly, the fact that D.G. was eventually placed at Kildonan pursuant to the IDEA settlement—and is doing well there—does not absolve the District of liability for its failures under Title II and Section 504 for the period at issue in this case. *See, e.g., Gabel v. Bd. of Educ. of the Hyde Park Central Sch. Dist.*, 368 F.Supp.2d 313, 336 (S.D.N.Y. 2005).

Evidence in the record also would support a finding of bad faith and/or gross misjudgment necessary to support a claim of intentional discrimination. *Bartlett*, 156 F.3d at 331; *see also Gabel*, 368 F.Supp.2d at 336; *B.D. v. DeBuono*, 130 F.Supp.2d 401, 439–40 (S.D.N.Y.2000); *W.B. v. Matula*, 67 F.3d 484 (3d Cir.1995).

Admittedly, plaintiff's case for the 2000–01 school year is much weaker than her case for the 2001–02 school year. However, since the case is going to trial, I will hear evidence pertaining to both years.

I find no evidence, however, to support any claims against defendants Liberty and Sheehan, who did not even assume their posts in Hyde Park until after the 2001–02 school year. All claims as to those defendants are dismissed.

### 2. Section 1983 Claims

Having found that Section 504 and/or Title II could have been violated, I turn now to the claims raised under 42 U.S.C. § 1983 ("Section 1983"), which are based on those alleged disability-rights deprivations.

Claims under Section 1983 lie only against state actors—that is, persons acting under color of state law—who deprive

the plaintiff of a right, privilege or immunity secured by the United States Constitution or a federal law. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). The Second Circuit has held that a Section 1983 claim can be maintained against individual defendants on the basis of Title II or Section 504 violations. *Weixel*, 287 F.3d at 151.

Defendants insist they are entitled to qualified immunity, and that no Section 1983 claim can lie against the District.

 Qualified immunity shields a public official from civil liability when his conduct "does not violate a clearly established statutory or constitutional right." *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir.1993); *Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir.2003). A public official is qualifiedly immune from suit if (1) his conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for the official to believe his conduct did not violate clearly established constitutional rights. *Lennon v. Miller*, 66 F.3d 416, 418 (2d Cir.1995); *Oliveira v. Mayer*, 23 F.3d 642, 648 (2d. Cir.1994).

 The issue of qualified immunity is a matter of law usually determined at the earliest point in a case, so that a defendant who is entitled to the doctrine's protections can take full advantage of them. *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

 Once accused, an individual defendant has the burden of proving that it was " 'objectively reasonable' for him to believe that his behavior did not violate plaintiffs' clearly established constitutional rights." *Lennon*, 66 F.3d at 418 (2d Cir.1995) (quoting *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). This issue has been discussed extensively in the context of police officers whose con-

duct allegedly violated an arrestee's rights. In those cases, objective reasonableness is established where "officers of reasonable competence could disagree" as to the legality of the defendant's actions. *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Actions will be found objectively unreasonable, and summary judgment will be denied, if "no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon*, 66 F.3d at 420–21. The Court must ascertain the "objective reasonableness" of the actions "assessed in light of legal rules that were 'clearly established' at the time the action was taken." *Id.* at 639 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In the context of school administrators and teachers, the question would be whether any reasonable teacher or administrator could believe that the alleged conduct would not violate a student's clearly established rights.

 For purposes of deciding the issue of qualified immunity, the only relevant inquiry is whether the constitutional right that plaintiffs claim was violated rests on law that is well-settled: if it does, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818–19, 102 S.Ct. 2727. Defendants' denials that teachers and administrators knew about the alleged harassment, "go to the question of whether the plaintiff's constitutional rights were violated, not the question of whether the officer was entitled to qualified immunity." *Stephenson*, 332 F.3d at 78 (citing *Saucier*, 533 U.S. at 205–06, 121 S.Ct. 2151).

 Since I have found that D.G.'s rights under Section 504 and Title II could have been violated, I must turn to the

question of whether those rights were clearly established at the time of the complained of activity. *Harlow*, 457 U.S. at 818–19, 102 S.Ct. 2727. I find that they were. While *Davis* involved peer *sexual* harassment, and this case involves peer *disability* harassment, the novel issue in *Davis*—decided in 1999—was school district liability for its response to peer-to-peer harassment (of any sort). Based on the Supreme Court's ruling in *Davis*, I find that "competent" public school teachers and administrators would know they could be held liable for peer disability harassment as well. *See Harlow*, 457 U.S. at 818–19, 102 S.Ct. 2727.

Finally, I must decide whether a reasonable teacher or administrator could have possibly believed that failing to protect D.G. from his peers and refusing to become more involved when plaintiff sought their help would not have violated D.G.'s rights. I find that plaintiff has alleged and offered evidence about conduct that no reasonable teacher or administrator could have thought did not violate D.G.'s rights. If, at trial, the evidence shows that the defendants did act reasonably under the circumstances, and that D.G.'s rights were not violated, then defendants will be exonerated on the facts. But if they violated D.G.'s rights, qualified immunity does not shield them.

As noted above, I find no basis for liability—on any claims—as to defendants Liberty and Sheehan, so of course the Section 1983 claims are dismissed as against them. Thus, defendant Burpee is the only individual as to whom Section 1983 liability could attach.

I will consider the District's *Monell* arguments at the close of plaintiff's case at trial. *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

*3. Article XI Claims*

■■■ Article XI of the Constitution of the State of New York states that the "legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." Article XI does not create a private cause of action. *See Donohue v. Copiague Union Free School Dist.*, 47 N.Y.2d 440, 443, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1979); *see also Sabur v. Brosnan*, 203 F.Supp.2d 292 (E.D.N.Y.2002).[16] Accordingly, the Article XI claims are dismissed as to all defendants.

**Conclusions**

(1) All claims are dismissed as against defendants Sheehan (Sheedhan) and Liberty.

(2) All claims against defendant Santora are dismissed for failure to prosecute.

(3) Plaintiff's claims under Section 504 of the Rehabilitation Act and Title II of the ADA remain as against defendants Burpee and the District.

(4) Defendant Burpee is not qualifiedly immune from suit under Section 1983.

(5) The Section 1983 claim against the District remains.

---

**16.** Plaintiff cites *Campaign for Fiscal Equity, Inc. v. State of New York*, 100 N.Y.2d 893, 769 N.Y.S.2d 106, 801 N.E.2d 326 (2003) for the proposition that the Court of Appeals has changed its position and now finds that Article XI supports a private right of action. The case does not support this conclusion; it deals only with the State's methods of funding education, not any instance of educational malfeasance towards a particular student, and appears to be brought on behalf of all New York City public schoolchildren.

(6) The claims under Article XI of the Constitution of the State of New York are dismissed as against all defendants.

Defendants' Motion for Summary Judgment (docket #13) is otherwise denied. The case remains open.

This constitutes the decision and order of the Court.