# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2608

_____

|  |  |  |
|---|---|---|
| M.P., by and through his parents and natural guardians K. and D.P., | * * * | |
| Appellant, | * | |
| | * | Appeal From the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Independent School District No. 721, New Prague; Arlene Pexa, | * * * | |
| Appellees. | * | |

_____

Submitted: February 14, 2003

Filed: April 16, 2003

_____

Before WOLLMAN, HEANEY, and MELLOY, Circuit Judges.

_____

HEANEY, Circuit Judge.

M.P., a disabled student, appeals the district court's grant of summary judgment to the New Prague School District on his claim under the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act, and 42 U.S.C. § 1983. We affirm the district court on his IDEA claim; remand his Section 504 claim; and find his § 1983 claim to be without merit, and therefore do not address it here.

I. Background

We review the facts of the case in a light most favorable to the appellant. M.P. is a sixteen-year-old student who is schizophrenic. He lives with his parents in New Prague, Minnesota, within the boundaries of the New Prague School District. He attended school in that district until the beginning of the 2000-01 school year, when his parents enrolled him in a public school in the Northfield School District through open enrollment. M.P.'s parents removed him from the New Prague School District because they believed it failed to enforce his rights as a disabled person, and because M.P. faced increased verbal and physical assaults and disability-related discrimination after the District's health paraprofessional, Arlene Pexa, disclosed M.P.'s schizophrenia to the school community.

During M.P.'s eighth-grade year, his family informed school administrators of his diagnosis. The District initiated a team meeting in February 1999 and developed a Section 504 Accommodation Plan, pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794, under which M.P.'s teachers were asked to monitor him for anxiety, hypervigilence, and anger management problems. As "modifications," M.P. was placed with other students with comparable abilities, given permission to meet with the school counselor or social worker when needed, and to access the school nurse as needed. As the Section 504 plan was being implemented, the District proposed evaluating M.P. for special education services. His parents consented to this course of action. During the course of the assessment, over a period of weeks, M.P. began taking medication for his schizophrenia, and there was noticeable improvement in his behavior. The assessment team decided that even though M.P. met the state eligibility criteria for emotional/behavioral disorder, special education services were

unnecessary. The parents agreed with the assessment team that an individualized educational program (IEP)[1] was not necessary for M.P.

The team amended the Section 504 plan in February 1999, and again in August 1999 to reflect M.P.'s changing needs as a result of his positive response to his new medications. M.P. was provided with extra time to complete tests and access to a learning lab class, and it was determined that the school social worker, Katie Hennessy, would monitor M.P.'s progress and maintain contact with his parents.

On January 10, 2000, the day that Pexa disclosed M.P.'s condition, M.P.'s mother, K.P., reported Pexa's disclosure to Hennessy, who did not investigate the complaint; rather, she took a "wait-and-see" approach to her concern. Within a short period of time, M.P.'s medical information became common knowledge within the student body, and M.P. was verbally and physically harassed by other students. M.P. did not tell his parents he suffered from harassment until April 2000.

Once M.P.'s parents were aware of the abuse, his mother contacted Hennessy and Connie Nicholson, the school principal, about the harassment. K.P. and Nicholson spoke on the phone two to three times a week so that K.P. could report the harassment that M.P. endured. M.P. was called "druggie," "fag," "psycho," "weirdo," "mental kid," "special," "squealer," and "idiot," among other names. Students also shoved M.P.'s head into the drinking fountain, picked him up by his throat, slammed

---

[1]The IEP is a comprehensive written statement developed jointly by the child's parents and the school district, which outlines the child's special educational needs and the specially designed instruction and services to be provided by the school system to meet those needs. 20 U.S.C. § 1414(d). The IEP must be reviewed annually to ensure that the district tailors the statutorily required, free, appropriate education to the child's unique needs. Honig v. Doe, 484 U.S. 305, 311 (1988); 20 U.S.C. § 1414(d)(4). We do not address whether the District failed to adequately meet M.P.'s special education needs by determining that he did not need an IEP.

him into lockers, threw him to the floor, shoved, scratched, spit on, and cut him. M.P. never had experienced this treatment by classmates before Pexa's disclosure of his medical information.

No investigation or corrective actions were undertaken during the remainder of the school year to reduce the harassment. During the summer, M.P. was subjected to the same provocations by his peers. His mother made calls to the District throughout the summer to provide additional information to school administrators about the harassment, to express her concern for her son's safety upon his return to school, and to seek solutions for the upcoming year. Because the District did not return her calls, K.P. sent it a letter from M.P.'s treating psychiatrist, Dr. Lea Hogan, to clarify M.P.'s stress about his relations with his peers. On August 29, 2000, K.P. met with district administrators, who offered three solutions to remedy what K.P. perceived to be an intolerable situation, all of which were unacceptable to K.P.: 1) M.P. could arrive late and leave early from his classes; 2) M.P. could attend school half a day and be home-schooled the other half of the day; or 3) M.P. could attend an alternative learning center that catered to students with emotional/behavioral disorders within the district. K.P. discussed the possibility of enrolling M.P. in the Northfield School District with Principal Nicholson, who suggested that the New Prague School District would be able to pay M.P.'s transportation costs to the Northfield high school. K.P. decided to enroll M.P. in the Northfield School District for the 2000-01 school year, and drove M.P. to and from school because the New Prague School District refused to assist with his transportation costs because he was enrolled in a different jurisdiction.

Pursuant to the IDEA, M.P.'s parents filed a request for an administrative hearing on November 28, 2000 before the Minnesota Department of Children, Families and Learning for violations of M.P.'s rights as a disabled student in the New Prague School District. The District requested and received summary judgment because the independent hearing officer and the hearing review officer agreed that the

responsibility for providing M.P. with appropriate educational services rested with his current school district, not the New Prague School District.

M.P.'s parents filed an action in district court against the District and Pexa, alleging that defendants discriminated against M.P. on the basis of his mental handicap in the education environment in violation of IDEA; Section 504 of the Rehabilitation Act; the Minnesota Human Rights Act (MHRA); Section 1983; the Minnesota Government Data Practices Act (MGDPA); and the Family Educational Rights and Privacy Act (FERPA). The district court granted summary judgment in the defendants' favor because M.P.'s IDEA claim was moot since he was no longer enrolled in the New Prague School District; he failed to show the defendants acted with the requisite discriminatory intent to adequately state a claim under Section 504 and the MHRA; he failed to establish the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct under § 1983; there was no connection between Pexa's disclosure and M.P.'s alleged damages to raise a valid claim under the MGDPA; and no private right of action exists under FERPA. M.P. appeals his claims related to IDEA, Section 504, and § 1983.

## II. Discussion

We review a district court's grant of summary judgment de novo. Thompson v. Bd. of the Special Sch. Dist. No. 1, 144 F.3d 574, 578 (8th Cir. 1998). After viewing the record in a light most favorable to the nonmoving party, summary judgment is appropriate only where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Id.

### A. IDEA

First, this proceeding involves the application and construction of the IDEA, 20 U.S.C. §§ 1400-1487. The IDEA provides federal money to state and local

education agencies in order to assist them in educating handicapped children on the condition that the states and local agencies implement the substantive and procedural requirements of the Act. The IDEA assures "that all children with disabilities have available to them a free appropriate education that emphasizes special education and related services designed to meet their unique needs." § 1400(d)(1)(A). Under the IDEA, a school district is required to provide an IEP for each disabled child. § 1414(d)(2)(A).

The IDEA provides procedural safeguards to permit parental involvement in all matters concerning the child's educational program and allows parents to obtain administrative and judicial review of decisions they deem unsatisfactory or inappropriate. Honig v. Doe, 484 U.S. 305, 311-12 (1988). For example, the IDEA requires that the parents of a disabled child be notified by the school district of any proposed change to their child's IEP. It also requires that the parents or guardian be permitted to participate in discussions relating to their disabled child's evaluation and education. 20 U.S.C. § 1415(b). If the parents or guardian are not satisfied with the IEP, they are entitled to request a due process hearing. § 1415(f). Under the Minnesota implementing statute of the IDEA, a parent may obtain a hearing when he or she objects to a proposed assessment; the transfer or placement of a child; and to the addition, provision, denial or removal of educational services. Minn Stat. § 125A.09 subd. 6. A due process hearing shall be "initiated and conducted by and in the district responsible for assuring that an appropriate program is provided." Id.

The IDEA permits any party that is dissatisfied with the outcome of the due process hearing to bring suit in state or federal court, 20 U.S.C. § 1415(i)(2), but that right of action is carefully circumscribed. As a condition precedent to its exercise, an aggrieved party must satisfy the IDEA's exhaustion provision, § 1415(l), with the exception of an occasion where exhaustion would be futile or inadequate. Honig, 484 U.S. at 327. Nevertheless, the IDEA's exhaustion requirement remains the general

rule, regardless of whether the administrative process offers the particular type of relief that is being sought.

The issue before us is whether M.P. is entitled to compensatory educational services from the New Prague School District under the IDEA even though his parents failed to exhaust his administrative remedies by requesting a due process hearing while he was still enrolled in that school district. Under Thompson v. Bd. of the Special Sch. Dist. No.1, 144 F.3d 574 (8th Cir. 1998), M.P.'s IDEA claim must fail. This court held in Thompson that "[i]f a student changes school districts and does not request a due process hearing, his or her right to challenge prior educational services is not preserved. Subsequent challenges to the student's previous education become moot because the new school district is responsible for providing a due process hearing." Id. at 579. M.P.'s parents did not request a due process hearing until after they enrolled M.P. in the Northfield public schools.

M.P. argues that more recent Eighth Circuit precedent, Indep. Sch. Dist. No. 284 v. A.C., 258 F.3d 769 (8th Cir. 2001), provides a means of relief for M.P. A.C. was a 15-year-old girl who had many school-related problems, which included classroom disruption, profanity, insubordination, and truancy. Outside of school she used alcohol and drugs, ran away from home, and was hospitalized three times for threatening or attempting suicide. The district agreed to an Independent Educational Evaluation of A.C. by a neuropsychologist, who concluded that A.C. should be placed in a secure residential treatment facility. The dispute went to an administrative hearing before the Minnesota Department of Children, Families and Learning, where it was determined by the independent hearing officer that the district should provide 100 hours of compensatory education and convene an IEP meeting to identify a residential placement for A.C. The hearing review officer affirmed, and the school district commenced an action in federal district court. The district court affirmed the award of compensatory education but reversed as to the residential placement decision, finding that residential placement was not necessary to address her

educational needs because A.C. was unable to attend the day program due to her behavioral problems.

A.C. appealed the district court's decision regarding residential placement. The school district argued the case was moot because A.C. had moved to another school district and conceded that the district was not responsible for prospective relief. In remanding the case for further consideration, Judge Richard Arnold distinguished Thompson from A.C.'s circumstances by explaining that Thompson's IDEA claim was moot because he failed to request a due process hearing prior to enrolling in a charter school, a new school district under Minnesota law. Judge Arnold explained that, unlike Thompson, A.C. had exhausted her administrative remedies:

> A.C.'s due process hearing is over. A.C.'s claim in this case concerns obligations the District allegedly had in the past and failed to meet. The remedy sought is compensatory. It does not matter whether the District has any present or future obligation to develop a new IEP for her or to give her further hearings. If A.C. or her mother had paid the costs of a private placement at the time, and then sued the District for reimbursement, the claim would not be moot . . . . [T]he claim is that the statute obligated the school district to pay for the placement during the time when it was responsible for the student's education. Assuming that A.C.'s claim has merit, it would not make sense to deny her a remedy against the District just because her parent did not or could not pay for the placement that the District denied her.

A.C., 258 F.3d at 774-75 (citation omitted). We do not see how the holding in A.C. can assist M.P. under the current circumstances. Whereas A.C.'s mother requested and received a due process hearing before removing her daughter from the delinquent school district, and had therefore preserved a record of the district's deficiencies for future litigation, M.P.'s parents failed to do so. We cannot provide relief under such circumstances. See also Smith v. Special Sch. Dist. No.1, 184 F.3d 764, 767 (8th Cir.

1999) (affirming the district court's dismissal of IDEA claim on the ground that plaintiff was not entitled to a due process hearing where he neither resided nor attended school at the time he requested the hearing on the basis of <u>Thompson</u>); <u>N.B. v. Alachua County Sch. Bd</u>., 84 F.3d 1376, 1379 (11th Cir. 1996) ("If parents can bypass the exhaustion requirement of the IDEA by merely moving their child out of the defendant school district, the whole administrative scheme established by the IDEA would be rendered nugatory.").

M.P. argues that the <u>Thompson</u> holding unfairly requires him to forego his entitlement to due process and remedial relief for violations of his civil rights as a disabled student and relieves the New Prague School District of any liability for its violations. M.P. also asserts that he still lives in the New Prague School District even though he attends a Northfield school, and suggests that because he remains within the bounds of the New Prague School District, it still has jurisdiction over his claim. We determined in <u>Thompson</u>, where the student's residence remained the same after he enrolled in a charter school, that "[i]f a student changes school districts and does not request a due process hearing, his or her right to challenge prior educational services is not preserved." 144 F.3d at 579. Even though the court is sympathetic to M.P.'s concerns that the New Prague School District inadequately addressed his special education needs under the IDEA, it is bound by the <u>Thompson</u> holding. We therefore affirm the district court on this matter.

B. Section 504

Section 504 of the Rehabilitation Act prohibits discrimination on the basis of handicap in programs receiving federal financial assistance. 29 U.S.C. § 794(a). It provides in relevant part, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

To establish a prima facie case of disability discrimination under Section 504, the plaintiff must prove: (1) he is a qualified individual with a disability; (2) he was denied the benefits of a program or activity of a public entity receiving federal funds; and (3) he was discriminated against on the basis of his disability. Timothy H. v. Cedar Rapids Cmty. Sch. Dist., 178 F.3d 968, 971 (8th Cir. 1999). "A defendant to such a claim is entitled to assert as an affirmative defense that a requested accommodation would constitute an undue burden." Id. Further, M.P. must make a showing of "either bad faith or gross misjudgment . . . before a [Section] 504 violation can be made out." Monahan v. State of Neb., 687 F.2d 1164, 1171 (8th Cir. 1982).

Neither party disputes that M.P. is a qualified individual with a disability within the meaning of the Rehabilitation Act, satisfying the first requirement of a Section 504 claim. M.P. argues that on the basis of his schizophrenia, defendants acted in bad faith or with gross misjudgment because they failed to provide him with accommodations in the educational environment; failed to investigate allegations of disability discrimination, student-against-student harassment, hostile education environment, and disclosure of personal information; and failed to take appropriate and effective remedial measures once notice of harassment was provided to school authorities.

In response, appellees assert that there are no facts to suggest personal animosity, ill will, or discriminatory intent on their part. They claim that M.P. never told an administrator or teacher about the harassment that he suffered, although he apparently told one lunch aide about having been pushed into a locker. Appellees also state that Principal Nicholson called M.P.'s parents, informed the Dean of Students about their complaints, and asked teachers to monitor M.P.'s interactions with his peers. No teachers reported having witnessed any harassment. Furthermore, they allege that Pexa did not disclose M.P.'s disability with deliberate indifference.

-10-

The disclosure occurred when Pexa requested an explanation as to the purpose of the new medication that M.P.'s mother delivered to her.

We note that although school officials regularly updated M.P.'s Section 504 plan prior to the disclosure of his disability, it was not amended after the disclosure. The resulting distress that M.P. experienced undoubtedly demanded the attention of his teachers and school administrators and required modifications to his accommodation plan, which he never received. Although M.P. may not have complained to the school faculty about the harassment he suffered, his mother called school administrators on a weekly basis to discuss the harassment. One could therefore find that the District acted in bad faith or with gross misjudgment on the basis of its failure to return M.P.'s mother's repeated phone calls regarding the safety of her son, the school administrators' proposals to either drastically alter M.P.'s school day or send him to an alternative school for behaviorally troubled students, and the District's assurance that it could cover the costs of M.P.'s transportation to the Northfield School District, and rescission of that offer once M.P. had enrolled in Northfield. Whether Pexa acted with deliberate indifference to the confidentiality of M.P.'s disability is irrelevant if it can be shown that the District acted in bad faith or with gross misjudgment when it failed to take appropriate action to protect M.P.'s academic and safety interests after the disclosure, pursuant to the Rehabilitation Act. Because there are disputed facts regarding the effect of the disclosure, the resulting harassment, and the District's failure to address and remedy the discrimination that M.P. may have experienced due to his disability, we remand this claim to the district court for further consideration.

For the reasons stated, the judgment of the district court is affirmed with respect to M.P.'s IDEA and § 1983 claims. We remand the case with respect to M.P.'s Section 504 claim for further proceedings consistent with this opinion.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.