*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0238p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

S.S., a minor, by and through his parents and next of friends,

                *Plaintiff-Appellant,*

     *v.*

EASTERN KENTUCKY UNIVERSITY; ELLEN RINI, and JACQUELINE VANCE,

                *Defendants-Appellees.*

No. 06-6165

———————————

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 03-00020—Joseph M. Hood, District Judge.

Argued: March 14, 2008

Decided and Filed: July 2, 2008

Before: MOORE, GILMAN, and SUTTON, Circuit Judges.

———————————

## COUNSEL

———————————

**ARGUED:** Katherine K. Yunker, YUNKER & ASSOCIATES, Lexington, Kentucky, for Appellant. Douglas L. McSwain, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, for Appellees. **ON BRIEF:** Katherine K. Yunker, Katherine Shelby Sanford, YUNKER & ASSOCIATES, Lexington, Kentucky, for Appellant. Douglas L. McSwain, Merrie Kristin Winfrey, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, for Appellees.

     GILMAN, J., delivered the opinion of the court, in which MOORE and SUTTON, JJ., joined. In addition, MOORE, J. (pp. 12-13), delivered a separate concurring opinion.

———————————

## OPINION

———————————

     RONALD LEE GILMAN, Circuit Judge. From 2000 to 2003, S.S. was a student at the Model Laboratory Middle School (Model), which is operated by Eastern Kentucky University (EKU) to train student teachers under the supervision of certified teachers. S.S. has various disabilities, including cerebral palsy, attention deficit/hyperactivity disorder, dyslexia, pervasive developmental disorder, and post-traumatic stress disorder. During his attendance at Model, S.S. was involved in numerous physical and verbal altercations with other students, leading S.S. to

complain that he was being bullied and harassed. Model investigated the incidents as they occurred, determining that some were initiated by S.S. and some were initiated by other students. In response, Model took various steps as the school administration deemed appropriate, including interviewing S.S. and his classmates, disciplining the students that it found to be culpable, monitoring S.S., and at times separating S.S. from his harassers.

S.S. left Model after successfully completing the sixth, seventh, and eighth grades. He subsequently filed suit against EKU, Model's director Jacqueline Vance, and Model's psychologist Ellen Rini, alleging that the defendants had discriminated against him on the basis of his disability, in violation of both federal and state law. The district court granted summary judgment in favor of the defendants. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

# I.  BACKGROUND

## A.      Factual background

The district court summarized this case as arising "out of a long and unfortunate string of incidents that occurred during Plaintiff's time at Model. . . . [T]he core of all of Plaintiff's allegations is the failure of Model and its administrators, particularly Vance and Rini, to adequately respond to those incidents and maintain a safe educational environment for Plaintiff." *S.S. v. E. Ky. Univ.*, 431 F. Supp. 2d 718, 722-23 (E.D. Ky. 2006). Because the district court's 32-page opinion and order granting summary judgment in favor of the defendants sets forth an accurate description of the numerous incidents that underlie S.S.'s claims, we need not repeat them here. As will be discussed in Part II below, the key issue in this case is not the specific details of each confrontation between S.S. and his peers, but rather the overall adequacy of Model's response to those confrontations.

## B.      Procedural background

S.S. filed suit in the district court in January of 2003, alleging numerous claims under federal and state law against EKU as an entity and against Vance and Rini in both their individual and official capacities. (The defendants will henceforth be collectively referred to as "Model.") S.S. contended that Model's conduct in disciplining and monitoring him, its failure to respond to and adequately investigate his complaints of discrimination and harassment, and its failure to discipline and monitor the students who harassed him constituted discrimination on the basis of his disability, in violation of both Title II of the Americans with Disabilities Act of 1990 (the ADA), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973 (§ 504), 29 U.S.C. § 794.

He further asserted that Model deprived him of his constitutional rights to due process and equal protection, in violation of 42 U.S.C. § 1983. As to his due process claim, S.S. alleged that Model's failure to end the harassment "intruded upon [his] liberty interest to be free from psychological and bodily abuse." His equal protection claim was based on the argument that Model treated him differently from other students by reason of his disabilities, thereby depriving him of equal protection under the law.

Finally, S.S. raised two tort claims under Kentucky state law. The first was a negligence claim, alleging that Model breached its duty to protect him from the harassment and, as a result, caused him bodily harm and other injuries. His second state-law claim was for the intentional infliction of emotional distress, based on allegations that Model's actions constituted intentional and/or reckless conduct that offended generally accepted standards of decency and morality.

The first decision in this case took place in January of 2004, when the district court dismissed all of S.S.'s claims without prejudice after finding that he had not first exhausted his administrative remedies under the Individuals with Disabilities Education Act (the IDEA), 20 U.S.C. § 1400.

S.S. appealed that decision to this court and simultaneously pursued his administrative remedies for the same claims that he had raised in his complaint.

After a due process hearing before an administrative hearing officer and a review of the hearing officer's decision, the Kentucky Department of Education's Exceptional Children Appeals Board ultimately found, among other things, that Model had not denied S.S. a free and appropriate public education (FAPE) under the IDEA. The issues decided in the administrative proceeding are not before us because S.S. did not appeal the Appeals Board decision.

Following the conclusion of the administrative proceedings, this court reviewed S.S.'s appeal from the district court's dismissal of his claims and found that S.S. had subsequently exhausted his administrative remedies. It then declared his appeal moot, reinstated his claims, and remanded the case to the district court for further proceedings on the merits. Model later moved for a judgment on the pleadings as to a number of S.S.'s claims. It conceded, however, that S.S.'s § 504 claims against Vance and Rini in their official capacities and his negligence claims against them in their individual capacities could proceed to discovery. S.S. in turn conceded that his ADA and § 504 claims against Vance and Rini in their individual capacities lacked merit. The district court then dismissed with prejudice some, but not all, of S.S.'s claims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

In the meantime, S.S. initiated several discovery requests, asking Model to produce student records, confidential notes, incident files, discipline documents, and significant behavior reports, among other things. He further asked Model to produce all of the foregoing documents "that were created, prepared, or otherwise generated during the period by Model personnel or by Model students that mention or refer to any Model middle school student but that do not mention or refer to S.S., his parents, this lawsuit, or the claims in this Complaint." S.S.'s stated reason for seeking these documents was to demonstrate disparate treatment between himself and other students and between other students with disabilities and nondisabled students, and to show discrimination in the school's policies and procedures.

Model objected to the request on the grounds that it was overbroad and unduly burdensome because it would have required Model to produce every document that made mention of any middle-school student for a five-year period (420 students in total). The school also questioned the relevancy of school records for students who were not in S.S.'s grade and who therefore were not S.S.'s peers. Model noted that it had already produced the discipline and incident records of all of the 71 students in S.S.'s class, as well as the academic records for 32 of those students. The magistrate judge assigned to the case denied S.S.'s request, finding that it was too broad, unduly burdensome, and not likely to lead to admissible evidence. This ruling was affirmed by the district court.

Model then prepared a motion for summary judgment. In doing so, it requested and was granted permission to file a 50-page memorandum in support of its motion, 10 pages longer than the 40 pages allowed by the district court's local rule. The court, in fairness to S.S., also increased to 50 pages the limit applicable to S.S.'s response brief. One day before the response was due, however, S.S.'s counsel asked for permission to file a 75-page brief. The court denied that request.

After reviewing Model's motion for summary judgment and S.S.'s response, the district court concluded that the parties "tell markedly different versions of many events, but . . . those differences are not material." It then granted summary judgment to Model on all of S.S.'s remaining claims. S.S. timely appealed, raising several issues. First, he argues that the district court erred in denying his discovery request and in refusing to increase the page limit for his brief in response to Model's motion for summary judgment. He also argues that the district court's opinion granting summary judgment to Model "ignores evidence, draws inferences in Defendants' favor, weighs

evidence, and makes determinations of credibility." As to the court's ruling on his substantive claims, S.S. asserts that it applied the wrong standard to his ADA and § 504 claims, erred in finding that his § 1983 and state-law claims fail as a matter of law for lack of evidence of discrimination, and erroneously concluded that Vance and Rini were entitled to qualified immunity with regard to the § 1983 and state-law claims.

## II.  ANALYSIS

### A.     Discovery and page-limit claims

#### 1.        *Denial of discovery request*

S.S. challenges the district court's denial of his discovery request that sought the records of all Model students other than S.S during a five-year period. He argues that he was deprived of relevant evidence and that the denial of his request was an abuse of discretion.

"[T]he scope of discovery is within the sound discretion of the trial court," and a "ruling by the trial court limiting or denying discovery will not be cause for reversal unless an abuse of discretion is shown." *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981). "An abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made." *Bush v. Rauch*, 38 F.3d 842, 848 (6th Cir. 1994). Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that a court "may order discovery of any matter relevant to the subject matter involved in the action." The extent of discovery may be limited by the court if it determines that "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2)(c)(iii).

Searching the records of 420 students, identifying all documents that make reference to a student other than S.S., and then copying and producing a set of those documents for S.S. would no doubt have been a very lengthy and burdensome task for Model to carry out. Furthermore, the relevance and probative value of the records of students who were not in S.S.'s grade or who did not attend Model at the same time that S.S. attended the school is minimal given the fact that S.S.'s claims are based on incidents of harassment by his peers and the purportedly discriminatory ways in which Model responded to those incidents. The most relevant records instead relate to S.S.'s classmates and any disabled students among them. According to the magistrate judge, S.S. in fact received the discipline, incident, and, in many cases, the academic records of his classmates, including the records of several disabled students in his class. In light of the relevant evidence produced, we conclude that the district court did not abuse its discretion in denying S.S.'s overbroad discovery request.

#### 2.        *Denial of request to increase the page limit of S.S.'s response brief*

S.S. next argues that the district court arbitrarily restricted the length of his response to Model's motion for summary judgment to 50 pages. Joint Local Rule 7.1 of Civil Practice for the U.S. District Courts for the Eastern and Western Districts of Kentucky imposes a 40-page limit on all memoranda. The interpretation and application of local rules "are matters within the district court's discretion, [and] the district court's decision is reviewed for abuse of discretion." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 714 (6th Cir. 2006).

In denying S.S.'s request for a further increase in the page limit, the district court provided a reasoned explanation that was based on its knowledge of the case and considerations of fairness. The court pointed out that Model had been able to abide by the expanded 50-page limit in submitting its brief, which addressed the same record and legal issues faced by S.S. It also noted that S.S. had waited until the last minute to make his request, and that Model would be prejudiced if the court

increased the page limit as to S.S. when Model had been limited to 50 pages. S.S.'s counsel, moreover, conceded that she could in fact comply with the 50-page limit if required to do so.

After denying the request, the district court granted a three-day extension to allow S.S.'s counsel to conform her response to the 50-page limit. These facts belie S.S.'s allegation that the court's refusal to increase the page limit was arbitrary. Furthermore, S.S.'s counsel failed to identify any facts or arguments that she was prevented from asserting as a result of the decision. We therefore conclude that the district court did not abuse its discretion in denying S.S.'s request for an increase in the page limit.

**B.          Standard of review for a grant of summary judgment**

We review de novo the district court's grant of summary judgment as to S.S.'s substantive claims. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**C.          Claims under the ADA and § 504**

S.S. framed his ADA and § 504 claims as asserting two types of violations. First, he claimed that Model's actions in responding to and investigating his complaints of discrimination and harassment, as well as in monitoring and disciplining him and his alleged harassers, were discriminatory. Second, he claimed that the peer-on-peer harassment he experienced created a hostile learning environment, and that Model failed to adequately protect him from it. The district court analyzed the ADA and § 504 claims accordingly, but ultimately concluded that, under a bad-faith and gross-misjudgment standard of conduct, Model was entitled to summary judgment.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act likewise provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

"Apart from [§ 504's] limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes are precisely the same." *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n.6 (2d Cir. 2002). Neither of these differences between the ADA and § 504 is at issue in S.S.'s case. We will therefore analyze S.S.'s ADA and § 504 claims together. *See Thompson v. Williamson County*, 219 F.3d 555, 557 n.3 (6th Cir. 2000) (noting that the plaintiff's ADA and § 504 claims may be analyzed together because the statutes provide the same remedies, procedures, and rights); *see also Maddox v. Univ. of Tenn.*, 62 F.3d 843, 846 n.2 (6th Cir. 1995) (concluding that the protections under the ADA parallel the protections available under the Rehabilitation Act, so that the court's reasoning with respect to the Rehabilitation Act "applied with equal force to the ADA claim").

Accordingly, a plaintiff seeking to state a claim under either the ADA or § 504 against a school receiving federal financial assistance must show that he or she is (1) disabled under the

statute, (2) "otherwise qualified" for participation in the program, and (3) being excluded from participation in, denied the benefits of, or subjected to discrimination under the program by reason of his or her disability. *Maddox*, 62 F.3d at 846. The discrimination requirement

> is rooted in two parts of the statute's text: plaintiffs must prove that they have either been subjected to discrimination or excluded from a program or denied benefits solely by reason of their disability. To prove discrimination in the education context, something more than a mere failure to provide the free appropriate education required by [the IDEA] must be shown.

*Sellers v. Sch. Bd. of Manassas*, 141 F.3d 524, 528-29 (4th Cir. 1998) (internal quotation marks omitted).

Although S.S. framed his ADA and § 504 allegations as raising two different types of claims—discriminatory responses to the harassment and, separately, a failure to respond to the harassment—all of his claims arise from the same allegations of peer-on-peer harassment. We therefore analyze them as asserting a disability-based peer-on-peer harassment claim.

Model argues that we should evaluate that claim under the analytical framework set forth in *Davis v. Monroe County Board of Education*, 526 U.S. 629, 645-47 (1999), a peer-on-peer sexual harassment case that was brought under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). *Davis* requires a showing of deliberate indifference on the part of the school in order to impose liability, and has been applied to disability-based peer-on-peer harassment claims brought under the ADA and § 504 by the majority of federal district courts to have addressed the issue. *See, e.g.*, *Werth v. Bd. of Directors of the Pub. Sch. of Milwaukee*, 472 F. Supp. 2d 1113, 1127 (E.D. Wis. 2007); *K.M. v. Hyde Park Central Sch. Dist.*, 381 F. Supp. 2d 343, 359 (S.D.N.Y. 2005); *Biggs v. Bd. of Educ. of Cecil County*, 229 F. Supp. 2d 437, 445 (D. Md. 2002). *But see M.P. v. Indep. Sch. Dist. No. 721*, 326 F.3d 975, 982 (8th Cir. 2003) (applying a bad faith or gross misjudgment standard and, without acknowledging *Davis*, citing a pre-*Davis* Eighth Circuit case that did not involve claims of peer-on-peer harassment).

In response, S.S. argues that he has alleged facts showing that Model was deliberately indifferent to the harassment that he experienced. He does not argue that a different standard should be applied. Because the parties effectively agree that *Davis*'s deliberate-indifference standard should be applied in this case, we will evaluate S.S.'s peer-on-peer harassment claim accordingly. This does not preclude us, however, from considering a different standard of review if and when the issue is presented to us in a future case of peer-on-peer harassment.

The Supreme Court in *Davis* determined that schools "are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A school district that is sued for peer-on-peer harassment, the Supreme Court explained, is not held liable for the actions of the harassing students, but instead is held liable for its own "deliberate indifference" to the students' harassing acts. *Id.* at 641-42.

The facts alleged in *Davis* showed that the school district was aware that a male high-school student had engaged in repeated acts of sexual harassment toward a female classmate over a five-month period, including verbal harassment and "numerous acts of objectively offensive touching," but that the school had "made no effort whatsoever either to investigate or to put an end to the

harassment." *Id.* at 653-54. The Court held that the plaintiff's allegations survived the school's motion to dismiss because "[t]he district's knowing refusal to take any action in response to such behavior would fly in the face of Title IX's core principles, and such deliberate indifference may appropriately be subject to claims for monetary damages." *Id.* at 651.

The most recent federal court to apply *Davis* to a disability-based peer-on-peer harassment claim articulated the following five-part test that must be met to impose liability:

> (1) the plaintiff is an individual with a disability, (2) he or she was harassed based on that disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment, (4) the defendant knew about the harassment, and (5) the defendant was deliberately indifferent to the harassment.

*Werth*, 472 F. Supp. 2d at 1127 (citing *K.M.*, 381 F. Supp. 2d at 359 (articulating the same five-part test), and *Biggs*, 229 F. Supp. 2d 437 (same)). Applying this test to the present case, S.S. must show that (1) he was an individual with a disability, (2) he was harassed based on his disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his education and created an abusive educational environment, (4) Model knew about the harassment, and (5) Model was deliberately indifferent to the harassment. *See Biggs*, 229 F. Supp. 2d at 445 (citing *Davis*, 526 U.S. at 650).

The parties do not dispute that the first and fourth prongs are satisfied. And although questions of fact exist regarding the second and third prongs, we need not address them because, as the following analysis bears out, we conclude that Model was not deliberately indifferent (under the fifth prong) to the peer-on-peer harassment at issue here.

S.S. alleges that Vance and Rini denied that a bullying problem existed and that they failed to consider the possibility that he was not the source of the problem. These allegations, however, are not only unsupported by the record, but are squarely contradicted by it. The record shows that Model responded to all of the alleged incidents involving S.S. of which it was made aware, and that its responses included conducting individual and group interviews with S.S.'s classmates in an attempt to determine who was at fault, instructing S.S.'s classmates not to taunt him, arranging for outside speakers to talk to the students about name-calling, identifying related topics for discussion at school assemblies and in small groups, monitoring S.S., at times separating S.S. from other students who had been involved in the altercations, holding a mediation session between S.S. and another student, disciplining both S.S. and the other students who were found to be at fault, calling the police, having the police talk to an offending student, and calling the other students' and S.S.'s parents to discuss the disciplinary problems. Indeed, S.S. does not dispute that Model responded by taking the foregoing actions—although he argues that such actions were discriminatory.

The cases of *K.M.* and *Biggs* are instructive in determining whether Model's actions evinced a deliberate indifference to S.S.'s situation. In *K.M.*, a disabled child had repeatedly been subjected to verbal abuse and physical attacks over the course of two middle-school years, including disability-related slurs. The student and his mother reported each incident to the school, but school officials initially took no action to protect him from further harassment. After the student was beaten up on a schoolbus, the school advised his mother to keep him out of school for an indeterminate period of time, but provided no educational services for him. Furthermore, no one was disciplined in connection with the incidents, which caused the student to become suicidal. He subsequently sued the school under the ADA and § 504 for inadequately responding to the peer-on-peer disability-based harassment. The district court denied the school's motion for summary judgment, concluding that triable issues of fact existed with respect to the school district's lack of response to the student's repeated complaints. 381 F. Supp. 2d at 348-51, 360-61; *see also Davis*,

526 U.S. at 653-54 (reversing the district court's grant of the school's motion to dismiss where the harassment was reported to school authorities, but no disciplinary action was taken in response and no effort was made to separate the harasser from the plaintiff).

*Biggs* similarly involved a disabled student and her mother who reported incidents of harassment to school administrators. But in *Biggs* the school took action each time, including counseling the child, meeting with the offending students, sending letters to parents, threatening the offenders with suspension, and alerting teachers to the problem. Concluding that such responses established that the school was not deliberately indifferent to the harassment, the court granted the school's motion for summary judgment. 229 F. Supp. 2d at 445.

Model, unlike the schools in *K.M.* and *Davis*, took the affirmative steps described above to address the incidents of harassment involving S.S. And Model's actions closely mirrored those of the school in *Biggs*—specifically, meeting with the students, communicating with parents, and disciplining the offending students. In sum, this case is easily distinguishable from *Davis* and *K.M.* Even viewing the record in the light most favorable to S.S., proof is lacking as to what Model could have or should have done differently in order to bring the peer-on-peer harassment to a stop. The record in this case does not give rise to an inference that Model was deliberately indifferent to S.S.'s situation or that it had an attitude of permissiveness that amounted to discrimination.

As for S.S.'s claim that Model's responses to the harassment—including the investigation, discipline, and monitoring of S.S.—were discriminatory, the district court aptly observed that S.S.'s allegations suffer from a fundamental flaw: "According to Plaintiff, virtually everything Defendants did in response to incidents was discriminatory, including the actions Defendants took that were the opposite of other actions that Plaintiff also claims were discriminatory." The district court further explained that the incidents that S.S. raised as examples of purportedly disparate treatment of himself as compared to other students who also complained of harassment do not support a finding that Vance and Rini discriminated against S.S. by reason of his disability. After Model investigated the various complaints lodged by S.S. and by other students, it concluded that the circumstances of each incident were different with respect to the level and type of harassment and who was involved, thus warranting different responses. We find no fault with the district court's reasoning on this issue and therefore affirm its grant of summary judgment to Model on all of S.S.'s ADA and § 504 claims.

## D.    Procedural due process violations

The district court also found that S.S.'s complaint did not allege a violation of his procedural due process rights. S.S. never amended his complaint in order to assert such a claim, and instead argues on appeal that his allegation of an "'immediate' suspension states a claim for deprivation of protected interests without the minimum procedures due him." Our review of S.S.'s complaint reveals that the district court properly determined that the complaint lacked any allegation of a procedural due process violation. *See* Fed. R. Civ. P. 8(a) (providing that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"). We therefore decline to address the merits of S.S.'s procedural due process argument and affirm the district court's dismissal of that claim.

## E.    Substantive due process violations

S.S. also alleges that Model violated his right to "be free from intrusions of his liberty without due process of law." Specifically, he contends that Model's failure to protect him from peer-on-peer harassment intruded upon his "liberty interest to be free from psychological and bodily abuse." The district court initially construed his claim as a possible ADA violation "sounding in substantive due process," but ultimately granted Model's motion for summary judgment on this claim, concluding that S.S. could not prevail under the state-created-danger exception to the general

rule of *DeShaney v. Winnebago County Department of Social Service*, 489 U.S. 189, 197, 200 (1989).

*DeShaney* holds that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id*. at 197. The district court concluded that S.S. had failed to show an affirmative act by Model that created substantive due process liability, and that, even if S.S. had succeeded in doing so, there was no evidence from which a reasonable jury could find that Model's response to the harassment was so egregious as to be arbitrary in the constitutional sense. Our analysis of S.S.'s ADA claims, set forth in Part II.C. above, fully supports the district court's determination on this issue.

**F.        Section 1983 claims**

S.S.'s final federal-law claim is that Vance and Rini are liable in their individual capacities for allegedly depriving him of his constitutional rights to due process and to equal protection, in violation of 42 U.S.C. § 1983. In his complaint, he alleged that Vance's and Rini's "failure to protect [him] from the harassing, abusive, and discriminatory actions" of the other students "have intruded upon [his] liberty interest to be free from psychological and bodily abuse," and that their failure to do so deprived him of his right to equal protection "by treating him differently from other, non-disabled students, and by discriminating against him by reason of his disability." The district court granted summary judgment to Vance and Rini on these claims because it found that S.S. had failed to produce any evidence of discrimination and, alternatively, because the individual defendants were entitled to qualified immunity.

S.S.'s equal protection claim arises from the same allegations that he asserted in support of his ADA and § 504 claims. Thus the gravaman of S.S.'s equal protection claim is that, because he is disabled, Vance and Rini failed to protect him from the harassment he experienced, and that such failure constituted discrimination in violation of his right to equal protection under the law. S.S.'s brief on appeal simply asserts that, for purposes of his equal protection claim, S.S. "pointed to evidence supporting the conclusion that Defendants discriminated against him." In response, Model contends that "[t]he record as a whole demonstrates [that S.S.] was treated fairly and in the interest of safety and order."

Section 1983 states in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

For the reasons discussed in Parts II.C.-E. above, S.S.'s due process claims fail as a matter of law, leaving only his equal protection claim in need of further discussion.

The Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying to any person within its jurisdiction the equal protection of the laws. "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). In essence, a State must "treat similarly situated individuals in a similar manner." *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1360 (6th Cir. 1996) (internal quotation marks omitted).

Disabled persons are not a suspect class for purposes of an equal protection challenge. *See Tennessee v. Lane*, 541 U.S. 509, 522 (2004) (explaining that "classifications based on disability

violate [the Equal Protection Clause] if they lack a rational relationship to a legitimate governmental purpose"). A state may therefore treat disabled students differently, so long as its actions are rationally related to some legitimate governmental purpose. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366-68 (2001). "In opposition to a motion for summary judgment, it is [the] plaintiff who possesses the burden of demonstrating that the defendants treated similarly situated individuals in a disparate manner." *Buchanan*, 99 F.3d at 1360 (granting summary judgment to the school because, after the school principal submitted an affidavit attesting that he had treated the African-American plaintiff no differently than other students, the plaintiff did not bring forth any evidence of similarly situated Caucasian students who were treated better).

S.S. therefore has the burden of showing that (1) Vance and Rini intentionally treated him differently—because he is disabled—than similarly situated students who were like him in all relevant respects, and (2) the defendants' actions bore no rational relationship to a legitimate governmental purpose. In light of the district court's lengthy discussion of the various incidents of harassment, we simply note that the record contains no evidence showing that Vance and Rini were indifferent to the harassment that took place, as discussed in Part II.C. above, much less that any perceived failure on their part to protect him was the result of intentional discrimination. And any evidence that S.S.'s disability may have influenced the way in which Vance and Rini responded to the incidents does not necessarily save S.S.'s equal protection claim. *See Garrett*, 531 U.S. at 366-68.

Model contends that its responses to the harassment were intended to maintain order and safety in the school, and that this is a legitimate educational purpose. *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999) (cautioning that "courts should refrain from second guessing the disciplinary decisions made by school administrators"); *Ingraham v. Wright*, 430 U.S. 651, 681-82 (1977) ("Assessment of the need for, and the appropriate means of maintaining, school discipline is committed generally to the discretion of school authorities . . ."); *Goss v. Lopez*, 419 U.S. 565, 580 (1975) (stressing the need for school administrators to often take "immediate, effective action" to maintain discipline in public schools, and that "[s]ome modicum of discipline and order is essential" to education); *see also Martin v. Temple*, No. 97-5577, 1998 U.S. App. LEXIS 1680 at *2-3 (6th Cir. Feb. 2, 1998) (affirming the grant of a motion to dismiss to a school on a disabled student's equal protection claim because the actions of the school's disciplinary committee in expelling her were rationally related to its "legitimate purpose of maintaining a safe environment" on its campus where the school presented evidence showing that the student had interfered with her fellow students' ability to pursue their course work).

Model also contends that its decisions were based on information it gained from the various investigations it conducted, as well as the interviews it held with S.S.'s classmates. Those interviews support Model's argument that it had a legitimate basis for disciplining S.S., who the students said was often responsible for the incidents, in addition to the other students found to be involved in the harassment. Even S.S.'s mother acknowledged that S.S. was "caus[ing] some others to get aggravated." And a number of S.S.'s classmates told Vance and Rini that the S.S. was treated *better* than other students, and that teachers would "take pity" on him and "take up for him" when he was being bothered by other students. Indeed, S.S. has failed to cite any evidence suggesting that Model's decision to monitor or separate S.S. was based on anything other than its interest in managing the conflicts that arose, protecting S.S. and other students, and preventing harassment, whether instigated by other students or by S.S.

In light of the foregoing evidence and the record as a whole, we conclude that no reasonable jury would find that Vance and Rini intentionally discriminated against S.S. because of his disability. The district court therefore properly granted summary judgment to the defendants on his equal protection claim. And because we have concluded that Vance and Rini did not violate S.S.'s right to equal protection, we have no need to discuss the availability of qualified immunity for the

defendants in this case. *See Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007) (explaining that, "[i]n resolving questions of qualified immunity, courts are required to resolve a threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." (internal quotation marks omitted)).

## G.     Tort claims under state law

S.S.'s complaint also asserted two causes of action against Vance and Rini under Kentucky state law:  negligence and outrageous conduct (the latter also being known as intentional infliction of emotional distress).  Vance and Rini are alleged to have acted negligently and outrageously by "repeatedly ignoring Plaintiff's requests for help, creating an atmosphere of hostility toward Plaintiff and his disabilities, and refusing to stop the persistent harassment and abuse by other students at Model."  The district court granted summary judgment for Model on both claims, concluding that S.S.'s negligence claim failed to raise a genuine issue of material fact and similarly finding that the record contained no evidence on which a jury could find that Vance's and Rini's conduct "offend[ed] against the generally accepted standards of decency and morality."

For purposes of S.S.'s negligence claim, the "special relationship . . . formed between a school district and its students imposes an affirmative duty on the district, its faculty, and its administrators to take all reasonable steps to prevent foreseeable harm to its students." *See Williams v. Ky. Dep't of Educ.*, 113 S.W.3d 145, 148 (Ky. 2003) (internal quotation marks omitted).  S.S.'s allegations of negligence, however, are simply not supported by the evidence in the record for the same reasons discussed in Part II.C. above.  If anything, the record supports the district court's conclusion that Vance's and Rini's  conduct—investigating S.S.'s complaints, disciplining the students responsible for harassment, monitoring S.S., and educating the students generally about name-calling and sexual harassment—was reasonable and satisfied the very duty that S.S. alleges they breached.

S.S.'s claim of outrageous conduct fails for the same reason.  The cause of action for the intentional infliction of emotion distress "is intended to redress behavior that is truly outrageous, intolerable and which results in bringing one to his knees." *Osborne v. Payne*, 31 S.W.3d 911, 914 (Ky. 2000).  Four elements must be satisfied in order to state such a claim:  "[1] [t]he wrongdoer's conduct must be intentional or reckless; [2] the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; [3] there must be a causal connection between the wrongdoer's conduct and the emotional distress[;] and [4] the distress suffered must be severe." *Id*. at 913-14.  We agree with the district court that no reasonable jury could find that Vance's and Rini's responses to S.S.'s complaints of harassment were in any way outrageous, intolerable, or offensive to generally accepted standards of decency.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

———————————

## CONCURRENCE

———————————

KAREN NELSON MOORE, Circuit Judge, concurring. I write separately simply to identify yet a third possible standard for assessing a school's liability for peer-harassment suits under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq. The majority opinion has identified two possible standards: (1) deliberate indifference and (2) bad faith or gross misjudgment. If the issue arises in a future case, however, we could also consider applying a negligence standard. I believe that a close reading of Supreme Court precedent, as well as statutory interpretation of the ADA, Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq., and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., demonstrates that negligence is still another standard that should be considered in the future for evaluating a school's liability in peer-harassment suits under the ADA.

A handful of district courts apply the "deliberate indifference" standard established in the Supreme Court decision recognizing peer-harassment claims under Title IX, *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), to peer-harassment suits under the ADA. In *Davis*, the Court offered three rationales for articulating a standard in the Title IX context that is highly deferential to schools. First and foremost, the Court explained that because Congress enacted Title IX pursuant to its authority under the Spending Clause, Congress was obligated to "speak with a clear voice" to ensure that states are aware of the conditions accompanying federal funding. *Id.* at 640 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Therefore, the Court followed the reasoning of a prior decision recognizing teacher-harassment suits under Title IX, which limited "the scope of liability in private damages actions. . . . [in accordance with] *Pennhurst*'s requirement that funding recipients have notice of their potential liability." *Id.* at 641 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287-88 (1998)). Second, the Court highlighted "textual differences between Title IX and Title VII," observing that Court opinions invoking agency principles in the Title VII context did so on the ground that the "definition of 'employer' in Title VII includes agents of employer." *Id.* at 643 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 79 1-92 (1998)). Third, the Court stated that "particularly when viewed in conjunction with the requirement that the recipient have notice of Title IX's prohibitions to be liable for damages," Title IX's "plain language," stating that no person should be "subject to discrimination" under any federally funded program, "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser." *Id.* at 644.

Although the ADA shares with Title IX language prohibiting a covered entity from making a person "subject to discrimination," the *Davis* opinion's first and second rationales for the "deliberate indifference" standard are not applicable to the ADA. Unlike Title IX, Congress passed the ADA pursuant to its authority under the Commerce Clause and not the Spending Clause. 42 U.S.C. § 12101(b)(4) (stating that the purpose of the chapter is "to invoke the sweep of congressional authority . . . to regulate commerce"). Moreover, the definition of "employer" in Title I of the ADA and the definition of "public entity" in Title II of the ADA extends the Act's coverage to agents of employers and agencies and other instrumentalities of state and local governments. 42 U.S.C. §§ 12111(5)(A), 12131(1)(B). These key differences between Title IX and the ADA suggest that the logic of *Davis* does not apply to the ADA, even while it may apply to Section 504 of the Rehabilitation Act ("Section 504") passed pursuant to Congress's Spending Clause powers. Our prior decisions analyzing ADA and Section 504 claims together did not address liability for peer-harassment, *see e.g., Thompson v. Williamson County*, 219 F.3d 555, 557 n.3 (6th Cir. 2000), and do not foreclose our delineation of different standards for peer-harassment claims under these two statutes.

In a future peer-harassment suit under the ADA, we may consider adopting the standard that we employ in coworker-harassment suits under Title VII. In *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829 (6th Cir. 1999), we discussed the Supreme Court's use of agency principles in *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998), to define employer liability under Title VII for supervisor harassment. We reasoned that while *Ellerth* provided for employer liability in cases in which the agency relationship aided the supervisor in committing the harassment, such a holding could not be extended to cases of coworker harassment because "a coworker does not have power or authority emanating from the employer over the victim." *Fenton*, 174 F.3d at 829. Instead, we held that "[t]he victim of coworker sexual harassment must therefore prove negligence by the employer." *Id.* We stated that to demonstrate a prima facie case of employer liability for coworker sexual harassment, a plaintiff must demonstrate that "the employer knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action." *Id.* at 830. Peer harassment in the school context can be analogized to coworker harassment in the employment context. Both involve horizontal relationships between the harasser and the victim and also lack an agency relationship between the harasser and the covered entity bearing the nondiscrimination mandate. Accordingly, if the issue occurs in a future case, we may consider analogizing to *Fenton* to apply that decision's negligence standard to a school's liability for peer harassment. The inquiry in a peer-harassment case would thus become whether the plaintiff had created a genuine issue of material fact regarding the defendant's unreasonable failure to take appropriate, prompt corrective action.

I concur in the majority opinion and judgment in this case because it is unnecessary here to decide which of these three possible standards should apply, given the parties' choice of the deliberate-indifference standard.